Cahill v. Perrine, &c.

CASE 68—INJUNCTION—FEBRUARY 3.

## Cahill v. Perrine, Etc.

APPEAL FROM MASON CIRCUIT COURT.

1. STATUTES — CONSTRUCTION — CONSTITUTIONAL   LAW — "TURNPIKE
   RAIDER ACT."—It is not a valid objection to the payment of
   expenses incurred under the act of May 20, 1897, known as the
   "Turnpike Raiders' Act," that the corporation for whose protec-
   tion the expenses were incurred had not filed a written ac-
   ceptance of the new Constitution pursuant to section 190 of
   that instrument.

2. CONSTITUTIONAL LAW—DESIGNATION OF PURPOSE OF LEVY.—Under
   the "Turnpike Raiders' Act" the expense of maintaining
   guards is to be paid out of the county's general expenditure
   fund and a designation in the levy of "General claim fund—
   20c." is sufficiently descriptive under section 180 of the Con-
   stitution.

3. SAME—CIRCUIT JUDGES CONSERVATORS OF THE PEACE.—Circuit
   judges are conservators of the peace and may properly dis-
   charge the duties imposed upon them by the "Turnpike Raid-
   ers' Act" without infringing section 28 of the Constitution.

E. L. WORTHINGTON FOR THE APPELLANT.   (L. W. GALBRAITH,
   OF COUNSEL.)

1. Upon judges, as such, no duties can be imposed, except those of

Cahill v. Perrine, &c.

a judicial nature. Constitution, secs. 27, 28; Cooley's Con. Law., 53.

2. A circuit judge is strictly a judicial officer. Muhlenberg Co. v. Moorehead, 20 Ky. Law Rep., 376; Fleming v. Trousdale, 85 Fed., Rep., 189; Pennington v. Woolfolk, 79 Ky., 13.

3. A grant of power carries with it the right to use means appropriate to the exercise of the power. Appeal of Norwalk St. Ry. Co., 37 Atl. Rep., 1086; case of Supervisors of Election, 114 Mass., 247.

4. Discussion of the constitutional provisions distributing the powers of government into three departments, the legislative, the executive and the judicial, have generally arisen in cases involving the power of appointment to office. Some cases hold it to be the exercise of executive power. Taylor v. Com., 3 J. J. M., 401; others that it is a power not embraced in the classification of the powers of government, and that it does not intrinsically belong in either department. Fox v. McDonald, 101 Ala., 51; Mayor of Baltimore v. State, 15 Md., 376. Which of these positions is the correct one, is not material to the present controversy, for the duties imposed on the circuit judges by the act of May 20, 1897, is not a duty of making an appointment to an office, but a purely executive duty.

5. The case of ex parte Siebold, 100 U. S., 371, is based upon that section of the United States Constitution which provides that Congress may vest the appointment of inferior officers in the courts.

6. Corporations in existence when the new Constitution was adopted which have not accepted its provisions, are not entitled to the benefit of future legislation, whether enacted for their benefit or not. Constitution, section 190.

7. Every resolution of a fiscal court levying a tax, must distinctly specify the purpose for which the tax is levied. Con., sec. 180.

L. W. GALBRAITH, IN A SEPARATE BRIEF FOR APPELLANT. (E. L. WORTHINGTON, OF COUNSEL).

1. The powers of government in this State are divided into three distinct departments. Con. of Ky., secs. 27, 28.

2. A circuit judge being of the judicial department can not exercise executive functions. Waymen v. Southard, 10 Wheaton,

Cahill v. Perrine, &c.

46; Bouvier's Law Dictionary, "executive"; Anderson's Law Dict., "judicial powers"; Cooley's Con. Lim., 91.

3. The duties imposed on the circuit judge and the powers confided to him by the Martin law are executive. Acts, 1897, p. 31.

4. The Legislature could not confer the power delegated by the Martin law on a circuit judge, because it is an executive function, nor upon him *eo nomine*, as a commissioner, because the Constitution does not allow him to hold any such office. Case of Election Supervisors, 114 Mass., 247; s. c. 19 Am. St. R., 341; Houseman, *et al.*, v. Kent, circuit judge, 58 Mich., 364; Norwalk St. Railway Co., on appeals, (Conn.), Art. R., 1080.

5. This doctrine is well established, being promulgated by the Supreme Court as early as 1794. Note by court on Todd v. U. S., 13 How., 53.

6. Cases relied on by appellee turn on some express constitutional provision; as *ex parte* Siebold, 100 U. S., 393; or on construction not in harmony with the ruling of this court, as Mayor, &c., of Baltimore v. State, 15 Md., 376 (74 Am. Dec., 572).

7. It is the generally accepted doctrine that appointment to office is an executive function. Taylor v. Com., 3 J. J. M., 401; Black's Const. Law, p. 79; City of Evansville v. State, 118 Ind., 426; State v. Noble, 118 Ind., 350; State v. Hyde, 121 Ind., 20; State v. Kennon, 7 Ohio St. Rep., 574.

8. There is a class of cases, relied on by appellee, which hold that certain general powers, commonly exercised by the people, such as the power to appoint or elect to office do not necessarily belong to either the legislative, executive or judicial departments. But the Legislature may, as the law-making power, when not restricted by the Constitution, provide for their exercise by either department of the government, or by any person or association of persons which it may choose to designate for that purpose. They really constitute in the government a fourth class of powers. Fox v. McDonald, 101 Ala., 51.

9. These cases are not in point in this action since the powers imposed on the circuit judge by the Martin law do not belong to this fourth class or general powers commonly exercised by the people, but are strictly executive and therefore within the limitation of the Constitution, and void. The Martin law, Acts of 1897, p. 31; Pennington v. Woolfolk, 79 Ky., 16; Black's Const. Law, 287-8.

10. When a statute is adjudged to be unconstitutional it is as if it had never been. Cooley's Const. Lim., 188.

Cahill v. Perrine, &c.

11. Both the Maysville and Lexington Turnpike Road Company and the Maysville & Mt. Sterling Turnpike Road Company having failed to accept the provisions of the present Constitution, are without right to the benefits of the Martin Law. Con. of Ky., sec. 190.

12. The fiscal court of Mason county has not distinctly specified that any part of the taxes levied for the year 1898, is for the purpose of paying the turnpike guards, therefore, these guards can not be paid out of said levy. Ky. Con., sec. 180.

W. H. WADSWORTH FOR APPELLEES. (L. W. ROBERTSON, OF COUNSEL).

1. The circuit judge, *eo nomine* could act as commissioner, in ordering the guards to be appointed. Ency. of Law, vol. 12, p. 8; Hayburn's case, 2 Dallas, 410; U. S. v. Ferreira, 13 How., 45, and note; Norwalk St. Ry. Co., Appeal, 37 Atl. Rep., 1088.

2. The rule now in Kentucky is, the power of appointment to office is not necessarily executive. Comrs. of Sinking Fund v. George, 104 Ky., 260.

3. The power of appointment to office may be exercised by any department of government. Ky. Stats., secs. 4252 to 4257; Norwalk St. Ry. Co. Appeal, *supra;* Fox v. McDonald, 46 Am. Rep., 98; Sawyer v. Dooley, &c., 32 Pac. Rep., 439; People v. Provines, 34 Cal., 520; Mayor, &c., of Baltimore v. State, &c., 74 Am. Dec., 572; State, &c., v. Higgins, &c., 28 S. W. R., 638; Story on Constitution, vol. 1, pp. 376, 380, 381; Comrs. of Sinking Fund v. George, *supra;* Speed, &c., v. Crawford, 3 Met., 213; Supervisors v. Rodgers, 7 Wall., 175; Barkley v. Comrs., 93 U. S., 264; McLean County v. Deposit Bank of Owensboro, 81 Ky., 260.

4. The act of the circuit judge in ordering guards was not an executive act at all. Crim. Code, secs. 375, 379; Fox v. McDonald, *supra;* People v. Long Island R. R., 31 N. E. R., 873; Norwalk St. Ry. Co. Appeal, *supra;* Morton v. Woodford, &c., 99 Ky., 369; Stone v. Wilson, 39 S. W., 49; Winston v. Stone, &c., 43 S. W., 398; Forsythe v. City of Hammond, 68 Fed. Rep., 775.

5. The levy was properly made and sufficiently specified. Marion County v. L. & N. R. R. Co., 91 Ky., 390; L. & N. R. R. Co. v. Pendleton County, 96 Ky., 491; Ky. Stats., secs. 1839, 1840; Shattuck v. Smith, 69 N. W. R., 10; Wells County v. McHenry, 74 N. W. R., 242.

6. The corporations were entitled to the benefit of the Martin law, so called, although they had not accepted the provisions of the Constitution of 1891. Bill of Rights, secs. 1, 14, 26; U. S. Con., Art. 14; Smith v. Ames, 169 U. S., 466; Railroad Tax Cases, 13 Wall., 733, 754, 755, 777; P. F. M. & C. Ry. Co. v. Com. 5 Am. Rep., 344.

E. L. WORTHINGTON, IN A PETITION FOR A REHEARING.

Citations: Ky. Con., secs. 27, 28, 140, 113, 126, 141, 139, 180, 190; Ky. Stats., secs. 966, 3715, 1776, 2672; Case of Supervisors of Election, 114 Mass., 247; Comrs. of Sinking Fund v. George, 20 Ky. Law Rep., 947; Cooley on Taxation, 141.

JUDGE HOBSON DELIVERED THE OPINION OF THE COURT.

This is an action by appellant, as a citizen and taxpayer of Mason county, to enjoin the payment by the sheriff of the county to his co-appellees, out of the county levy in his hands, certain allowances made to them by the Mason Fiscal Court, on the ground that the order of the county court levying the tax does not specify distinctly, as provided in section 180 of the Constitution, what part of the levy is to be used for this purpose, and that the claims were for services in guarding the property of two turnpike companies, under the act approved May 20, 1897, and could not be properly paid out of the county treasury, for the reason that these two corporations had not accepted the provisions of the present Constitution, and so were not entitled to the benefit of this act passed since its adoption.

The second of these objections will be noticed first, as its discussion will assist in the determination of the other. The act referred to is entitled "An act to prevent lynching and injury to and destruction of real and personal property in this Commonwealth at the hands of mobs or other riotous assemblages of persons, and to prevent the

posting and circulation of threatening letters, and to prescribe penalties for the enforcement of its provisions." The parts of it material to this controversy are as follows:

"Section 1. If any two or more persons shall confederate or band themselves together for the purpose of intimidating, alarming, disturbing or injuring any person or persons, or to rescue any person or persons charged with a public offense from any officer or other person having the lawful custody of any such person or persons with the view of inflicting any kind of punishment on them, or with the view of preventing their lawful prosecution for any such offense or to do any felonious act, they, or either of them, shall be deemed guilty of a felony, and upon conviction shall be confined in the penitentiary not less than one nor more than five years.

"Sec. 2. If any two or more persons shall confederate or band together and go forth for the purpose of molesting, injuring or destroying any property, real or personal, of any other person, persons or corporation, whether the same be injured, molested or damaged or not, they shall be guilty of a felony, and upon conviction shall be confined in the penitentiary not less than one nor more than five years."

"Sec. 5. That upon information being lodged with any county judge or circuit judge in this commonwealth by any reliable and credible person or persons, stating under oath that he has information or knowledge that causes him to believe, and that he and they actually believe. that two or more persons have banded or confederated together, or are about to do so, for the purpose of injuring or destroying any property, real or personal, tollgate, tollgate house, bridge or other property of any person, turnpike or railroad company or other corporation in the

Cahill v. Perrine, &c.

county, or for the purpose of intimidating or preventing the keeper of any tollgate or bridge from collecting toll, and shall describe the said property or person threatened, it shall be the duty of the said county judge or circuit judge to at once order the sheriff or any constable of the county to summon a posse of not less than two nor more than ten discreet, able-bodied men, between twenty-one and fifty years of age, for each piece of property threatened with injury or destruction, to be placed at or in such property, armed with guns and ammunition, until the judge is satisfied that the cause no longer exists, not to exceed thirty days at any one time; provided, however, at the expiration of thirty days if the court is satisfied from the information from a reliable source, that if said guard or guards are removed the property will be injured or destroyed, he may continue the guards for a period of thirty days longer, and so on, thirty days at a time, until he is satisfied that there is no further necessity therefor."

"Sec. 6. If the county judge, circuit judge, sheriff, or other peace officer shall refuse or fail to discharge any of the duties imposed upon him by the provisions of this act, or shall be guilty of a dereliction of duty as such officer in the premises, he shall upon conviction be fined not less than one hundred nor more than five hundred dollars, and shall forfeit his office as a penalty, in addition to the payment of said fine."

"Sec. 7. That the officer, for summoning the guards, shall be paid a fee of fifty cents for summoning said guard, and each guard shall be paid two dollars, or at that rate for each day he is on duty, to be paid upon the warrant of the county judge out of the county treasury and levy of that year."

"Sec. 11. As mobs and riotous assemblages of persons

in certain counties of this Commonwealth have for several months past been engaged, and are now engaged, in injuring and destroying real and personal property, and the good name of this Commonwealth demands that such unlawful conduct should be stopped as soon as possible it is hereby declared that an emergency exists, and this act shall take effect when approved by the Governor."

Proper complaint was made to the circuit judge of apprehended mob violence, and pursuant to these provisions, he ordered the sheriff to summon guards and prevent its perpetration. The court of claims allowed the guards for their services, as the statute provided; but it is insisted that they should not be paid, because their services were rendered in protecting the property of a corporation which had not complied with section 190 of the Constitution. That section reads as follows:

"No corporation in existence at the time of the adoption of this Constitution shall have the benefit of future legislation without first filing in the office of the Secretary of State an acceptance of the provisions of this Constitution."

The object of the statute quoted was to "maintain peace and order," preserve the good name of the Commonwealth, and check a spirit of lawlessness, that, if unrestrained, would eventually sap the foundation of civilized society. It was a valid exercise of the police power. The whole people of the State were vitally interested in the maintenance of the supremacy of the law, and an act to preserve the peace was a proper exercise of the police power, without regard to the protection it might afford to the property of any individual citizen. The State had a right to maintain order, although this might promote the interest of the corporation men-

Cahill v. Perrine, &c.

tioned, in common with the interests of the other citizens of the State. It is a matter of common observation that a spirit of disregard of law, if unchecked, will not be. confined to the original object of its hostility, but will gradually widen its range so as to include other persons and things. For th:s reason, a government that would maintain order must enforce respect for its laws, and check the beginnings of evil. The complaint made to the circuit judge in this case showed the existence of organized mobs, threatening one man that if he stayed where he was living, and collected tolls, they would hang him; that in another instance they had broken into a man's house, and threatened that, if he continued to reside there and collect toll, they would kill him, and thrash his wife and daughter; that they had cut down and destroyed property, and were threatening to do worse than they had done. It was the plain purpose of the statute to prevent, by the heavy penalties imposed, the bloodshed and other disturbances of society incident to such lawless conduct as this; and the circuit judge properly made the orders referred to. No society calling itself civilized could tolerate such conduct without losing the respect of its own citizens. It is immaterial whose property was protected. If the peace and good order of the State required the intervention of the authorities, the statute applied.

The other objection may be disposed of more briefly. Section 180 of the Constitution provides:

"Every act enacted by the General Assembly, and every ordinance and resolution passed by any county, city, town, or municipal board or local legislative body, levying a tax, shall specify distinctly the purpose for which said tax is levied, and no tax levied and collected for one purpose shall ever be devoted to another purpose."

The order of the fiscal court levying the tax referred to is as follows:

"On motion, it is ordered that the county levy for the present year be fixed at 67½ cents on each $100.00 worth of taxable property; said 67½ cents to be distributed to the various funds as follows:

Free turnpike fund ............................. 25     cts
School fund ................................... 15     cts.
M. & B. S. R. R. fund ......................... 2½    cts.
Infirmary fund ................................ 4      cts.
Turnpike and bridge fund ...................... 1      ct.
General claim fund ............................ 20     cts

67½ cts."

It will be seen that the statute requires the guards to be paid "out of the county treasury and levy of that year." We think this fairly means that they are to be paid out of the general fund, and the designation of this fund in the order as the "general claim fund" was, in our judgment, sufficiently specific, under the provision of the Constitution above quoted. The statute did not provide that the fiscal court should make a special levy for the payment of these claims, but expressly places them among the general expenses of the county, just as the guards of the county jail, or other such things coming up during the year, would stand under the previous statute.

The circuit judge, by statute is a conservator of the peace throughout the Commonwealth, and may properly discharge the duties imposed upon him by the act quoted, without infringing section 28 of the Constitution. See, also, Morton v. Woodford, 99 Ky., 369, [35 S. W., 1112]; Stone v. Wilson, 19 Ky. L. R., 136, [39 S. W., 49]. The judgment below is affirmed.

The whole court considered the case.

DISSENTING OPINION BY JUDGE GUFFY.

The object of this suit was to enjoin the county treas·urer and sheriff of Mason county from paying to the defendants, out of the county levy for the year 1898, certain claims allowed them by the Mason Fiscal Court for guard·ing toll gates on the Maysville and Lexington and Mays·ville and Mt. Sterling turnpikes, under an order of the judge of the Mason Circuit Court, made pursuant to section 5 of the act of May 20, 1897. The circuit court sustained a demurrer to the petition, and dismissed the same, and from that judgment this appeal is prosecuted. The judgment appealed from was affirmed by the majority of this court. I can not agree with the majority opinion in this case, and the question therein involved is of so much importance that I feel it to be my duty to file this, my dissenting opinion.

The following are the agreed facts in this case:

"The parties plaintiff and defendant hereto come, and for the purpose of the demurrer herein, and for considera·tion upon a hearing of same, consent and agree to the fol· lowing statements of facts relating to the matters set up in the petition herein to wit:

"First. It is agreed that the act entitled 'An act to prevent lynching and injury to and destruction of real and personal property in this Commonwealth, at the hands of mobs, or other riotous assemblages or persons, and to prevent the posting and circulation of threatening letters and to prescribe penalties for the enforcement of its pro-visions,' commonly called the 'Martin Law,' was regularly and duly passed by the Legislature of Kentucky, and approved by the Governor, and became a law on the 20th day of May, 1897, and same is made part hereof, and re· ferred to as if fully set out herein.

"Second.   That the Maysville & Lexington Turnpike
Road Company was incorporated under the laws of the
State of Kentucky on the 29th day of January, 1829, and
before the year 1856.   The said charter is made part here-
of, as if fully herein set out.   And that said company
has not accepted the provisions of the Constitution of
Kentucky passed on the 28th day of September, 1891, as
provided in section 190 of said Constitution.   That the
Maysville & Mt. Sterling Turnpike Company was incorpo-
rated under the laws of the State of Kentucky on the 29th
day of January, 1836, and before the year 1856.   The
charter of said company is now referred to and made part
hereof as if fully set out herein.   And that the last-named
company has not accepted the provisions of the said Consti-
tution according to section 190 of same.

"That the information upon which the circuit judge,
James P. Harbeson, acted in directing the sheriff to ap-
point and station the guards under which the claims in
the petition recited were contracted and allowed was as
follows, to wit:

" 'For order November 29, 1897, for gates and keepers,
Nos. 2 & 3, M. & L. T. P. R. Co.:

" 'Affiant W. W. Baldwin states:   That he is the presi-
dent and superintendent of the Maysville & Lexington
Turnpike Road Company, a corporation created, organized,
and existing under the laws of the State of Kentucky,
and has been so for the last twenty-five years past.   That
said company owns and operates a turnpike road from
Maysville, Mason county, Ky., to the south line of
said county, a distance of about 16½ miles in said county;
The same turnpike road extends through Fleming, Nich-
olas, Bourbon, and Fayette counties.   That on that portion
of said turnpike road so owned and operated by said com-

pany in Mason county there are three tollgates, located
as follows, to wit, one at the top of hill, adjacent and back
of Maysville, and about one mile from that city; another
located about 300 feet north of the bridge over North
Fork, and on the east side of the said turnpike road, and
about three miles south of the town of Washington; and
the other one mile south of the town of Mayslick, and on
the east side of said pike, being known, respectively, as
tollgates No. 1, No. 2, and No. 3.

He states that he has information that causes
him to believe, and that he actually believes,
that two or more persons have banded and
confederated together, or are about to do so, for the pur-
pose of injuring and destroying tollgates No. 2 and No. 3
on the said turnpike road in Mason county, Ky., and for
the purpose of intimidating and preventing the keeper of
said tollgates from collecting toll thereat. He states
that Mike Young is keeper of tollgate No. 2, and has been
for about thirteen years past, and has been during all of
said time collecting tolls thereat for said company at said
gate, and that John H. Cogan is the keeper of tollgate
No. 3, and has been for about fifteen years last past col-
lecting tolls thereat during all said time, and for said
company.

Affiant states further that on the night of
September 2, 1897, according to his information, at about
midnight, a band of about twenty-five men came to toll-
gate No. 2 that was being then, and theretofore had been,
kept by said Mike Young, and where he was living, and
cut down and removed the pole, and threatened said Mike
Young that if he should thereafter continue there, and col-
lect toll from persons traveling said turnpike road, they
would do him great bodily harm, and would hang him.

He states that this was the second occasion on which said tollgate had been so visited by tollgate raiders; the other occasion being on the 17th of August, 1897.

Affiant states that shortly preceding the 2nd of September, 1897, three guards, properly armed, were stationed and located at said tollgate to protect said tollgate keeper at said gate, and said guards were removed on the 30th of August, 1897, and after. they were so removed said tollgate was visited as above stated. He says that said guards were furnished by the judge of said Mason county, and that since said 2d of September, 1897, said gate has been guarded by three armed guards furnished by said county, the said county judge refusing to furnish guards any further.

Affiant further states that on the same night of September 2, 1897, at about 2 o'clock in the morning, a band of about twenty-five men came to tollgate No. 3, that was being then and had been theretofore kept by said John H. Cogan, where he was living, and broke open the front door of same, and cut down and removed the pole, and threatened said Cogan and his wife that if they thereafter continued to reside there, and collect toll from persons traveling on said turnpike road, they would burn said tollgate, and thrash his wife and daughter, and kill him; and that was the second occasion on which said tollgate had been visited by turnpike raiders, the other occasion being on August 17, 1897.

Affiant states that within the past three weeks he has received communications threatening to cut down and remove all of the tollgates in Mason county, above referred to, if he did not cease to collect toll thereat. Affiant states further that he is credibly informed, and he verily believes, that

Cahill v. Perrine, &c.

it is true that on the night of Saturday, November 27, 1897, an armed band of rioters and turnpike raiders visited the tollgates upon the Maysville and Mt. Sterling Turnpike Road Company's turnpike near Lewisburg, in Mason county, Ky., known as the "Williams Gate," and threatened to cut down the pole thereat, and intimidated the toll gatherers, and warned them not to collect any more toll at said gate; and said toll gatherers are no longer collecting toll at said gate because of said threats. He says that within the past two weeks turnpike raiders have destroyed gates in various other counties in this Commonwealth, and are still destroying them, and affiant is informed and believes that there is in this State and county an organized body of turnpike raiders, whose purpose is to destroy all tollgates in this Commonwealth, and to prevent the collection of any toll on any turnpike therein; and he says he believes from credible information and actual experience that, unless protection is immediately given, there will not be left by said mob a single tollgate in this county or State by January 1, 1898, and he believes, as aforestated, that, if said gates are not protected by guards located thereat, same will be raided, injured, and destroyed, and said tollgate keepers intimidated, and prevented from collecting tolls thereat. He states that said tollgate keepers are alarmed by said threats, and that unless they are protected, that they will abandon said gates, and cease collecting toll thereat. He therefore asks for at least ten guards to be stationed at tollgates No. 2 and No. 3, five at each gate, and kept there for at least thirty days, or until there is no longer any necessity to so guard and protect said gates. [Signed]        W. W. Baldwin.

" 'Subscribed and sworn to before me by W. W. Bald-

[ 35 ]

win this ———— day of November, 1897, and I further
certify that my commission expires 13th day of January,
1900. [Signed], Charles B. Pearce, Jr., Notary
Public.'

" 'Affiant John H. Cogan states: That he is a resident
of Mason county, Kentucky, and has been such for many
years; that he is fifty-seven years of age, and is keeper of
tollgate No. 3 on the Maysville and Lexington Turnpike
road running through said county, which is located and
situated on said turnpike road, in said county, about one
mile south of Mayslick, the tollgate being situated on the
east side of the said turnpike road, and near the residence
of Michael Burke. He states that he has been the keeper
of said gate for the past fifteen years, and resides in the
tollgate house and upon the tollgate premises situated at
said tollgate.

Affiant states further that on the night of Sep-
tember 2, 1897, at about 2 o'clock in the morning a
band of about twenty-five men came to the tollgate that
was being then, and had theretofore been, 'kept by him,
and where he was living, and broke open the front door
of same, and cut down and removed the pole, and threat-
ened affiant and his wife that if they should thereafter
continue to reside there and collect toll from persons trav-
eling on said turnpike road, they would burn said toll-
gate down, and that they would switch his wife and
daughter, and would kill him. He states that this is the
second occasion on which said tollgate has been visited
by tollgate raiders, the other occasion being on the 17th
of August, 1897.

He states that in the past month or two he has
received on divers and sundry occasions anonymous com-
munications, threatening harm to himself and family

should he continue to reside at said tollgate, and collect
toll thereat. He states that on Saturday night, Novem-
ber 20, 1897, he was warned and threatened not to collect
any more toll at his gate, and again on the night of Satur-
day, November 27, 1897, he was again threatened and
warned by three men who came through his gate, that he
must collect no more toll thereat, and that, if affiant did
not obey said threats and warning, the turnpike raiders
would visit affiant and his gate within the coming
week, and would burn the damned tollhouse, and affi-
ant with it, and that then affiant would have to quit col-
lecting toll.

He states that he believes, and that he has
reasonable grounds to believe, that more than two
persons have banded and confederated themselves to-
gether, and are about to do so, for the purpose of injur-
ing and destroying said tollgate and said tollgate house,
and the personal property therein situated belonging to
him, and also for the purpose of intimidating and pre-
venting him from collecting toll; and unless said tollgate
house and gate and himself are protected by a guard of
ten discreet, able-bodied men between twenty-one and
fifty years of age, properly armed, that said persons so
banded and confederated together will injure and destroy
said tollgate house and tollgate and his property therein
situated, and will intimidate and prevent him from col-
lecting tolls thereat and carrying on his lawful occupa-
tion. He therefore asks the circuit judge of this district
to order the sheriff of Mason county to summons a posse
of ten discreet, able-bodied men between twenty-one and
fifty years of age, and to place them at said tollgate,
armed with guns and ammunition, in order to protect
said tollgate and tollgate house and his personal prop-

erty therein situated, and also to protect him in the carrying out of his lawful occupation, and him and his family from the harm threatened them at the hands of these and other turnpike raiders.

[Signed]   John H.   his X mark   Cogan.

" 'Attest;    Chas. B. Pearce.

" 'Subscribed and sworn to by John H. Cogan this 29th day of ———, 1897.    My commission expires January 13th, 1900.   [Signed] C. B. Pearce, Jr., Notary Public.'

" 'Affiant Michael Young states: That he is a resident of Mason county, Ky., and has been a resident of said county all his lifetime; that he is forty years of age, and is keeper of tollgate No. 2 on the Maysville & Lexington turnpike road, which runs through said county, and which tollgate is located and situated on the east side of said turnpike road in the said county near the point where the said turnpike road crosses the North Fork. He states that he has been keeper of said tollgate thirteen years, and resides in the tollgate house and upon the tollgate premises located and situated at said point.

Affiant states further that on the night of September 2, 1897, at about midnight, a band of about twenty-five men came to the tollgate that was then and theretofore had been kept by him, and where he was living, and cut down and removed the pole, and threatened affiant that if he should thereafter continue to stay there, and collect tolls from the persons traveling on said turnpike road, they would do him great bodily harm, and would hang him. He states that this is the second occasion on which said tollgate has been so visited by tollgate raiders, the other occasion being on the 17th of August, 1897.

He says that shortly preceding the 2d of Sep-

tember, 1897, three guards, properly armed, were stationed and located at said tollgate to ·protect same and himself, and said guards were removed on the 30th of August, 1897, and after they were so removed said tollgate was visited as above stated.

He states that subsequent to the -last mentioned date he has been threatened and warned not to collect toll further at said gate, but that armed guards have been maintained at said gate at the expense of the Maysville & Lexington Turnpike Company since September 2, 1897, in order to protect the affiant in his lawful business. He states that on Sunday, November 28, 1897, three persons, who affiant learned and believes live in the Lewisburg precinct, came to affiant's gate, and warned and threatened affiant, and ordered him to cease collecting toll thereat, and said to affiant: 'You heard what we did last night, didn't you? [referring to the raiding of the Williams' gate on the Mt. Sterling turnpike and the Helena gate on the Helena pike] If you don't quit collecting toll, we will come around here some of these nights, and do you worse than we did over there.'

He states that he believes, and that he has reasonable grounds to believe, that more than two persons have banded and confederated themselves together, and are about to do so, for the purpose of injuring and destroying said tollgate and tollgate house and the personal property therein situated, which belongs to him, and also for the purpose of intimidating and preventing him from collecting tolls, and that, unless said tollgate house and gate and himself are protected by a guard of ten discreet, able-bodied men between twenty-one and fifty years of age, properly armed, that said persons so banded and confederated together will injure

and destroy said tollgate house and tollgate and his property therein situated, and will intimidate and prevent him from collecting tolls thereat, and carrying on his lawful occupation. He therefore asks the circuit judge of this district to order the sheriff of Mason county to summons a posse of ten discreet, able-bodied men between twenty-one and fifty years of age, and to place them at said tollgate, armed with guns and ammunition, in order to protect said tollgate house and tollgate and his personal property therein situated, and also to protect him in the carrying out of his lawful occupation, and him and his family from the harm threatened him. [Signed]

MIKE YOUNG.

" 'Subscribed and sworn to by Michael Young this —— day of November, 1897. My commission expires Jan. 13, 1900. [Signed] Charles B, Pearce, Jr., Notary Public.'

"That upon this information the said judge made the following order:

" 'To the Sheriff of Mason County: You are hereby directed and ordered to summons a posse of ten able-bodied, discreet men between the ages of twenty-one and fifty years, and place five of them at tollgate No. 2 on the Maysville & Lexington turnpike road near the bridge over the North Fork, and five of them at the tollgate No. 3 on said road, on the east side thereof, and near the residence of Michael Burke, the same now kept by John Cogan. You will arm these men with guns and proper ammunition, and keep said men at said respective tollgates for the term of thirty days, or until the further order of this court, for the purpose of protecting said tollgates from injury at the hands of any and all persons whatever. [Signed] Jas. P. Harbeson, J. of M. C. C.'

"And afterwards, and before the expiration of the thirty

days upon the affidavit of W. W. Baldwin, containing substantially similar information as the foregoing affidavits contained the said judge renewed the said order, and continued said guards at said gates for the term of thirty days, and all of said guards for which said claims are presented and allowed herein, so far as the Maysville & Lexington Turnpike Road Company is concerned, were ordered upon similar information and by similar orders at said gates Nos. 2 and 3, and gate No. 1, and the bridge of said company over the North Fork of the Licking river. That the information lodged with the said judge, and the orders made by him, for gates and gate keepers upon the Maysville & Mt. Sterling Turnpike Road Company's pike, for which the claims recited in the petition were given and allowed, were made upon similar information, and were similar orders; and the renewals thereof were upon similar information, and were similar to the renewal order hereinbefore set out.

'It is further agreed that the claims allowed by the fiscal court for guards to the various defendants herein, or their assignors, were properly and duly presented to F. P. O'Donnell, County Attorney of Mason county. Ky., and by him reported favorably to the fiscal court of Mason county, at its April term, 1898; and that the said claims were referred to a committee, who examined the same, and afterwards reported to said court the said claims, and the said claims were taken up by the court *scriatim*, and examined, and passed upon and allowed, and ordered to be paid; and that the said claims are fully set out in the records of said court made at said term, and that the records of said court at said term further disclose that these claims were allowed along with the miscellaneous claims of the county; that the records of

said court show that Esquire John J. Perrine moved that
the general claim fund be fixed at twenty cents on each
one hundred dollars of equalized property in Mason county,
and Esquire Rice moved that the general fund be fixed
at fifteen cents on each one hundred dollars, and that no
part of this fund be used for paying the guard claims
allowed by said court, which last motion, upon a vote, was
declared lost, and the original motion of Esquire Perrine
upon a vote was carried, and the levy for the general
claim fund fixed at twenty cents on each one hundred dol-
lars.

"L. W. Galbraith & E. L. Worthington.

"Attys. for Plaintiffs.

"L. W. Robertson & W. H. Wadsworth,

"For Defendants."

It will be seen from the foregoing that the question in-
volved is the constitutionality of so much of the act ap-
proved May 20, 1897, as requires the circuit judge, upon
the affidavit of one or more credible persons, to order the
sheriff to order guards for the purpose indicated in the
affidavit, and also requiring the fiscal court of the county
in which the guards are to serve to pay the expenses there-
of.

It is contended for appellant that the act, in so far
as it requires the circuit judge to make the order desired,
is unconstitutional, and therefore void. It will be seen
from the act that the failure of the county judge, the
circuit judge, or the sheriff to discharge any of the duties
required shall work a forfeiture of his office, and that he
shall be fined not exceeding $500. It is a fundamental
principle of organic law, both State and national, that
no man shall be deprived of life, liberty, or property with-
out due process of law; and it will be seen from the fore-

Cahill v. Perrine, &c.

going act in question that there is no provision made for the trial or investigation of the truth of the affidavit upon which the circuit judge is required to act but arbitrary power is given to any credible person to make affidavit, and then, under heavy penalties, the officers are required to comply with the requisitions of the act, and afford the relief demanded by the party making the affidavit. It will also be seen that the fiscal court of the county is not allowed any opportunity to investigate or determine as to the truth of the statement made in the affidavit, but is absolutely required to make an appropriation of money to pay for the same, and thus impose a burden upon the taxpayers of the county without any evidence whatever that any taxpayer is responsible for any danger, or has any intention to aid, encourage, or abet the crime or offense which it is assumed is about to be perpetrated. If such an act is not in violation of both the State and Federal Constitutions, it is difficult to conceive of any act that would violate either Constitution. It may be well doubted whether, under our form of government, such duty, if it can be constitutionally required of any person, can be required of the circuit judge. The litigation over the question of payment of the guards ordered would most likely have to be tried in the circuit court before the judge who had issued the order for the guards, and while the fact of having issued the order would not necessarily prevent the judge from passing upon the propriety of the payment thereof in the event of litigation coming before him, yet it would leave the judge in a very delicate position to hold that the claim of the guards was illegal or invalid when he in fact had ordered that they should perform the services then in controversy.

It is also insisted for appellant that the levy made by the fiscal court of Mason county for the payment of the guards in question is null and void under and by the provisions of section 180 of the Constitution. That portion of the Constitution applicable to such levy reads as follows: "Every act enacted by the General Assembly, and every ordinance and resolution passed by any county, city, town, or municipal board or local legislative body, levying a tax, shall specify distinctly the purpose for which said tax is levied." Now, we have a special act of the Legislature requiring a levy for a special purpose, and yet in the case at bar such levy for the special purpose aforesaid is not specified or identified. If the provision of the Constitution, *supra*, has no application to such levy as the one in question, I am utterly unable to see that it can have any application to any levy or appropriation whatever, and therefore becomes a dead letter. Moreover, I think the provision was intended for the benefit of taxpayers, and is a sound and useful provision. It was intended in part to prevent reckless or illegal appropriations and levying of taxes, and to require the power so levying the same to show specifically what taxes and for what purposes the levy is made, to the end that the taxpayers may be able to enjoin and prevent the collection of unconstitutional taxes, as well as to hold the authorities responsible for reckless and wasteful appropriations and levy of taxes; and it should be strictly enforced.

It is agreed in this case that the corporations for whose benefit the guards were appointed had not accepted the provisions of the present Constitution, and, I think, by section 190 of the Constitution, were absolutely prohibited from availing themselves of the provisions of the act in question; and for that reason, if for no other, the order

of the circuit judge was void and the action of the fiscal court in like manner null and void. Section 190 of the Constitution reads as follows: "No corporation in existence at the time of the adoption of this Constitution shall have the benefit of future legislation without first filing in the office of the Secretary of State an acceptance of the provisions of this Constitution." It is clear that the act under consideration was, in part, at least, enacted for the benefit of corporations in general. It is also clear that the act in question was passed after the adoption of the new Constitution, and therefore falls within the provisions of section 190; and, if section 190 does not preclude such corporations as those named in the case at bar from the benefit of such legislation, it seems to me that the section *supra* is a dead letter, and of no effect. It is well known that a number of corporations were in existence at the time of the adoption of the present Constitution, and many of such corporations claimed to have vested rights which could not be at all affected by the Constitution, or by any future legislation; and much litigation has arisen, as we all know, based upon such claims, some of which has been sustained by this court. It is well known as part of the history of this country that at this very time quite a number of corporations are claiming to have and exercise rights that are higher and above the Constitution of the State, and above all the acts of the General Assembly passed in pursuance thereof, and are refusing to pay county and municipal taxes levied and imposed by the laws of the State, unquestionably enacted pursuant to and under the requirements of the present Constitution; and yet, if the majority opinion in this case is to remain the law, then a number of the corporations in the State may impose this expense and tax

upon the several counties in which they may be situated for the purpose of having their property guarded, and yet refuse to pay any part of that same tax, and escape payment not only of that, but of all other taxes levied for county and municipal purposes. It seems to me that such construction of the law as given by the majority opinion is utterly indefensible from any legal standpoint, and is also unjust and inequitable as between the corporation and the taxpayers of the county or municipality.

It must be conceded that it is desirable and just that all persons resident of the State, and enjoying any of the benefits of our form of government, should be obedient to the provisions of the Constitution and laws enacted thereunder, and to promote such a state of affairs was doubtless one of the main objects of section 190, *supra*. It will not do to say that the object of the Constitution was to prevent the Legislature from making specific amendments to the charter of any such corporation, because, under the Constitution, there can be no such local legislation. It therefore follows that unless such corporations are denied the benefits of the general law passed after the adoption of the Constitution, then they are entitled to the full benefits of the law enacted, the Constitution to the contrary notwithstanding.

It seems to me that the majority opinion entirely nullifies sections 180 and 190 of the Constitution. In the case at bar the taxpayers of Mason county are required to pay the expenses of guards for these corporations, neither one of which has accepted the provisions of the Constitution. Not only so, but the citizens are required to pay a tax imposed without ever having a chance to make any defense, or to show that the credible person making the affidavit was misinformed, or that no such fact existed; and,

besides, it may well be doubted whether any act requiring the fiscal court to levy the tax upon the taxpayers for the protection of the person or property from apprehended danger could, in any state of case be valid. The imposition of this tax upon the people of the county can not be equitable or just, even if lawful, except upon the assumption that the people were at fault, or, in other words, morally responsible, for the apprehended danger of destruction of the property, which assumption is without any foundation, so far as this record shows. I therefore conclude that the act requiring the judge to make the order for the guard and the levy of taxes by the fiscal court are each and all in violation of the Constitution of the State and of the United States, and therefore void; and also that, independently of any question of law or the validity of the act, the same is inequitable and unfair, because it imposes burdens upon the taxpayers to prevent an assumed injury with which the citizen has no connection, and neither aids, countenances, nor abets. It was well known at the time of the adoption of the new Constitution that some corporations were claiming to be vested with certain valuable rights and privileges that were irrevocable. Among these rights was the right of exemption from taxation for county and municipal purposes, and also exemption from State taxation exceeding a specified amount. These or similar contentions it was feared had been sustained by this court, as well as by the Supreme Court of the nation.

It has been supposed that equality before the law was indispensably necessary to the existence of a republican government. In fact, there can be no republican government if some persons can with impunity defy some of the laws of the land, while

other persons must obey them all. The purpose and intent of section 190, *supra*, was as far as possible to invite and promote equality before the law, and to bring all persons into obedience to the law. It said to those corporations which claimed rights and privileges which were above the law that, "Unless you accept this Constitution as the supreme law of the land, you shall not have the benefit of future legislation." Could anything be more fair? The section also said to the other corporations and natural persons that, "If it be impossible to require these favored classes to obey the Constitution and laws which you are required to obey, we will see that such corporations shall not have the benefit of any future legislation; and this will, to some extent, at least, place all persons upon an equality before the law." But now, when section 190, containing that provision, comes before the court for the first time, it is held to have no application to this new law, now being enforced.

If some persons or corporations can with impunity defy and violate some laws which they do not approve, it necessarily follows that other persons will contemn and disregard laws inimical to their interest or taste.

It is vain to say that the act of 1897 under consideration is an act to prevent or punish crime. The law was ample for that purpose before. If any man had committed a crime, or was about to do so, the law provided ample means to prevent or punish. Inasmuch as the two companies who caused this enormous expense to be imposed upon the taxpayers of Mason county have refused to accept the provisions of the present Constitution, it is fair to presume that they are exempt from county taxation, or at least claim

or enjoy rights or privileges denied to the people generally.

For the reasons given, and others not necessary to mention, I respectfully dissent from the majority opinion in this case.

JUDGE WHITE CONCURRING.