Julius W. HOBSON, individually and on behalf of Jean Marie Hobson and Julius W. Hobson, Jr., et al., Plaintiffs,

v.

Carl F. HANSEN, Superintendent of Schools of the District of Columbia et al., Defendants.[*]

Civ. A. No. 82–66.

United States District Court
District of Columbia.

Feb. 9, 1967.

See also 256 F.Supp. 18.

[*] The Court takes judicial notice of the fact that the official position of several of the defendants named at the time this complaint was filed has been changed.

William M. Kunstler, Washington, D. C., and Jerry D. Anker, Washington, D. C., for plaintiffs.

David G. Bress, U. S. Atty., Joseph M. Hannon and Gil Zimmerman, Asst. U. S. Attys., for defendants United States District Judges.

Milton D. Korman, Acting Corp. Counsel for the District of Columbia at the time the complaint was filed, John A. Earnest, Robert R. Redmon and Matthew J. Mullaney, Jr., Asst. Corp. Counsel, for all defendants except United States District Judges.

Before WILBUR K. MILLER, Senior Circuit Judge, and FAHY and WRIGHT,** Circuit Judges.

FAHY, Circuit Judge, with whom WILBUR K. MILLER, Senior Circuit Judge, joins.

Plaintiffs seek a declaratory judgment and an injunction forbidding the exercise of authority by the members of the Board of Education of the District of Columbia, on the ground that D.C.Code § 31–101 (1961 ed.), under which they were appointed by the Judges of the United States District Court for the District of Columbia, is unconstitutional.

Section 31–101 in pertinent part provides:

> The members of the Board of Education shall be appointed by the United States District Court judges of the District of Columbia * * *.

Plaintiffs challenge also the manner in which the Board has been performing its functions.

The Chief Judge of the Circuit, under the authority of 28 U.S.C. § 291(c), designated Circuit Judge J. Skelly Wright to sit as a District Judge and to hear the case. Deeming the constitutional challenge to Section 31–101 not to be frivolous. Judge Wright, pursuant to 28 U.S.C. § 2284,[1] requested the Chief Judge of the Circuit to constitute a three-judge District Court to consider that issue. Hobson v. Hansen, 252 F.Supp. 4. The present three-judge court was constituted for that purpose. We convened and heard the motion of plaintiffs for summary judgment and the motion of defendants to dismiss count 1 of the complaint. This is the count which raises the constitutional question as to Section 31–101. Issues to be decided by Judge Wright alone are not discussed in this opinion.

---

** Sitting as District Judge by designation pursuant to 28 U.S.C. 291(c) (1964).

1. 28 U.S.C. § 2284 (1964) reads in part:
 In any action or proceeding required by Act of Congress to be heard and determined by a district court of three judges the composition and procedure of the court, except as otherwise provided by law, shall be as follows:
 (1) The district judge to whom the application for injunction or other relief is presented shall constitute one member of such court. On the filing of the application, he shall immediately notify the chief judge of the circuit, who shall designate two other judges, at least one of whom shall be a circuit judge. * * *

## I.

We note preliminarily the suggestion of defendants that the question as to the constitutionality of Section 31–101 is so insubstantial that a three-judge court was not required to consider it. We disagree for reasons set forth in the opinion of Judge Wright in Hobson v. Hansen, supra.

██ We also disagree with defendants' contention that plaintiffs lack standing to question the validity of Section 31–101. Suing in their own behalf and for the classes to which they belong, plaintiffs include pupils in the public schools which are administered by the Board, and parents and guardians of such pupils.[2] They are clothed with sufficient interest to challenge the authority of the Board to administer the schools, an authority which is separately alleged, in the counts pending before Judge Wright, to be exercised in a manner which deprives them of equal protection of the laws. In Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed. 2d 663, the Court stated that "the gist of the question of standing" is,

> Have the * * * [plaintiffs] alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult constitutional questions?

██ Plaintiffs are not mere federal taxpayers, as was the plaintiff denied standing in Frothingham v. Mellon, 262 U.S. 447, 43 S.Ct. 597, 67 L.Ed. 1078. They are closely involved as pupils, or as parents and guardians who have the right to direct the education of children under their control, Pierce v. Society of Sisters, 268 U.S. 510, 534–535, 45 S.Ct. 571, 69 L.Ed. 1070 and the

education of children is an important function of state and local governments. Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873. Defendants concede plaintiffs' standing to contest the manner in which the Board administers the schools. It is but a short step to standing also to challenge the constitutionality of the basic authority of the Board to do the administering. Unless persons in the position of plaintiffs have standing to do this the issue may escape resolution. This argues for resolving doubts in favor of plaintiffs in such a case; for there is no hard and fast rule which governs standing. As Mr. Justice Frankfurter said of a "case" or "controversy," whether or not standing emerges also depends in good part upon the "expert feel of lawyers." Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 594, 72 S.Ct. 863, 96 L.Ed. 1153 (concurring opinion). The right to take steps by judicial means not only to have the schools administered by valid methods but also to have them administered by those who may validly do so, pertains to children who under public law attend the schools, and their parents and guardians. The views of the commentators are not uniform, but we think the better view supports our position in the circumstances of this case. Compare Davis, " 'Judicial Control of Administrative Action': A Review," 66 Colum.L.Rev. 635, 659–66 (1966) and Jaffe, "Standing To Secure Judicial Review: Public Actions," 74 Harv.L.Rev. 1265, 1310 (1961), with Jaffe, Judicial Control of Administration Action, 459–500 (1965). And see Hart and Wechsler, The Federal Courts and the Federal System 174–75 (1953).

## II.

 On the remaining question before us we hold, first, that under Article

---

**2.** Plaintiff Jean Marie Hobson, an infant, is in a private school; and plaintiff Caroline Hill Stewart is a teacher in the schools administered by the Board and is under contract with the Board. It is doubtful that these two plaintiffs have standing. We decide the constitutional issue on the basis of standing of other plaintiffs. It seems unnecessary to decide definitely as to the standing of Miss Hobson or Miss Stewart. If, however, either desires a definitive decision it may be requested.

I, § 8, cl. 17, of the Constitution, Congress was empowered to enact Section 31–101 of the Code, requiring the members of the Board of Education to be appointed by the judges of the United States District Court for the District of Columbia. The constitutional provision referred to provides:

> The Congress shall have Power * * * To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States * * *.

As a consequence of this provision and of Article III of the Constitution [3] our District Court [4] has a dual character. It shares the judicial power of the United States as a District Court established under Article III.[5] But it also has the powers conferred upon it in the exercise by Congress of its plenary legislative power over the District of Columbia. This dual character, with its combination of powers stemming from both Article I and Article III, is described in O'Donoghue v. United States, 289 U.S. 516, 545–546, 53 S.Ct. 740, 748, 77 L.Ed. 1356:

> In dealing with the District, Congress possesses the powers which belong to it in respect of territory within a state, and also the powers of a state. Keller v. Potomac Elec. Co., 261 U.S. 428, 442, 443, 43 S.Ct. 445, 67 L.Ed. 731. "In other words," this court there said, "it possesses a dual authority over the District and may clothe the courts of the District not only with the jurisdiction and powers of federal courts in the several States but with

such authority as a State may confer on her courts * * *. Subject to the guaranties of personal liberty in the amendments and in the original Constitution, Congress has as much power to vest courts of the District with a variety of jurisdiction and powers as a state legislature has in conferring jurisdiction on its courts. In Prentis v. Atlantic Coast Line Co., supra, [211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150] we held that when 'a state Constitution sees fit to unite legislative and judicial powers in a single hand, there is nothing to hinder so far as the Constitution of the United States is concerned.' (211 U.S. 225, 29 S.Ct. 67, 69, 53 L.Ed. 150); Dreyer v. [People of State of] Illinois, 187 U.S. 71, 83, 84, 23 S.Ct. 28, 47 L.Ed. 79.

The dissent of Chief Justice Hughes, Mr. Justice Van Devanter and Mr. Justice Cardozo adds strength to the view of the majority concerning the powers Congress may confer on the courts of the District. Their disagreement was with the view that the courts of the District of Columbia were not merely courts established, to quote the dissent, "under the broad authority conferred upon the Congress for the government of the District of Columbia by paragraph 17 of § 8 of article I." 289 U.S. at 552, 53 S.Ct. at 751. They described this as a

> power complete in itself and derives nothing from § 1 of Article III. It is a power not less complete, but essentially the same as that which is conferred upon the Congress for the government of territories. * * * It is not a dual power in the sense that it is derived from two sources, that is, both from Article III and also

---

3. "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. * * *" U.S.Const. art. III § 1.

4. We use at this point the terminology sometimes used by the parties, as if the Code confers the appointing power upon the court. The Code, however, confers the power upon the "judges." The ex-

ercise of non-judicial functions by judges as individuals has not been uncommon. Examples readily come to mind and need not be detailed. See, e. g., Exec.Rep. No. 7, 80th Cong., 1st Sess. 7–8 (1947). The examples which are there criticized do not include the functions placed upon our District Court judges by Section 31–101 of our Code. We have more to say about this infra.

5. See 28 U.S.C. §§ 88, 132 (1964).

from the constitutional provision for the government of the District, but is dual only in the sense that the latter provision confers an authority so broad that it enables the Congress to invest the courts of the District not only with jurisdiction and powers analogous of those of federal courts within the States but also with jurisdiction and powers analogous to those which States may vest in their own courts.

289 U.S. 552, 53 S.Ct. at 751.

While the dissenters considered that if the limitations with respect to tenure and compensation which attached to Article III courts were applicable to our local courts of general jurisdiction this would prevent attaching to the latter powers of an administrative sort, this in no way detracts from their view of the broad powers conferrable by Congress upon our courts [6] under Article I. Moreover, the view of the dissenters that Article III courts could not be vested with administrative responsibilities does not indicate that they would hold invalid such appointive power as is vested in the judges by Section 31–101 of our Code, especially in light of the appointive power which may be conferred upon Article III courts under Article II, § 2, cl. 2 of the Constitution, discussed in Part III of this opinion.

Again, in National Mut. Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 590–592, 69 S.Ct. 1173, 93 L.Ed. 1556, it is said:

It has long been held that Congress may clothe District of Columbia courts not only with the jurisdiction and powers of federal courts in the several states but with such authority as a state may confer on her courts.

\*　　\*　　\*　　\*　　\*　　\*

It is too late to hold that judicial functions incidental to Art. I powers

of Congress cannot be conferred on courts existing under Art. III, for it has been done with this Court's approval. O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356. In that case it was held that, although District of Columbia courts are Art. III courts, they can also exercise judicial power conferred by Congress pursuant to Art. I. The fact that District of Columbia courts, as local courts, can also be given administrative or legislative functions which other Art. III courts cannot exercise, does but emphasize the fact that, although the latter are limited to the exercise of judicial power, it may constitutionally be received from either Art. III or Art. I, and that congressional power over the District, flowing from Art. I, is plenary in every respect.

The foregoing is from the opinion of Mr. Justice Jackson, who announced the judgment of the Court and was joined in his opinion by Mr. Justice Black and Mr. Justice Burton. While there was no opinion which had the adherence of a majority of the Court, the correctness of O'Donoghue v. United States, supra, is unquestioned by the concurring and dissenting Justices. See 337 U.S. at 608–609, 638–640, 69 S.Ct. 1173, Mr. Justice Rutledge, writing the concurring opinion for himself and Mr. Justice Murphy, could not join in the view that conferment by Article I of plenary powers to legislate for the District enabled Congress to extend to citizens of the District the right to invoke in nonfederal or diversity cases the jurisdiction of District Courts throughout the nation. He said:

I think that the Article III courts in the several states cannot be vested, by virtue of other provisions of the Constitution, with powers specifically denied them by the terms of Article III.

337 U.S. 607, 69 S.Ct. 1185.

---

**6.** The courts of this District involved in *O'Donoghue* were the Supreme Court of the District of Columbia, predecessor of the United States District Court, and the Court of Appeals of the District of Columbia, predecessor of the United States Court of Appeals for the District of Columbia Circuit.

He then turned to the argument to the contrary based upon *O'Donoghue*, and said:

> With the merits of the O'Donoghue decision in holding that Article III barred salary reductions for judges of the courts in question, we are not presently concerned. Suffice it to point out that the express language of the O'Donoghue decision negatives the view that federal courts in the several states share this hybrid heritage: " * * * Congress derives from the District clause distinct powers in respect of the constitutional courts of the District which Congress does not possess in respect of such courts outside the District."

337 U.S. at 608–609, 69 S.Ct. at 1186.

The dissenting opinion of Chief Justice Vinson, with whom Mr. Justice Douglas joined, makes clear that the difficulty confronting the Court in *Tidewater* was the enlargement by Congress through Article I of the judicial jurisdiction over cases or controversies of Article III courts not located in the District of Columbia. This difficulty does not accompany the conferment by Congress through Article I of an appointing power upon the judges of our District Court. In its reference to *O'Donoghue*, the Chief Justice's opinion states:

> Two separate but related points concerning the case should be emphasized. The first is that since the District of Columbia courts may be given non-judicial duties, Butterworth v. United States ex rel. Hoe, 1884, 112 U.S. 50, 5 S.Ct. 25, 28 L.Ed. 656; Baldwin Co. v. Howard Co., 1921, 256 U.S. 35, 41 S.Ct. 405, 65 L.Ed. 816; Keller v. Potomac Electric Co., supra, [261 U.S. 428 (1923)] reliance upon that case to support the Act now under consideration is incompatible with the position that constitutional courts may only decide "cases" and "controversies" of a judicial nature. The second is that the rationale of the O'Donoghue case is, by its terms, limited to courts of the District.

337 U.S. at 638–639, 69 S.Ct. at 1206. And it was this concern for the limitation of the Article III "judicial power" to "cases" or "controversies" that, as it seems to us, was at the roots of the separate dissent of Mr. Justice Frankfurter, in which Mr. Justice Reed joined. 337 U.S. at 646–55, 69 S.Ct. 1173. It should here be interpolated that the statute now before us does not attempt to confer a jurisdiction such as was involved in *Tidewater*. It lodges only a specific power of appointment in the judges. None of the various views expressed in *Tidewater*, particularly in reference to *O'Donoghue*, left any cloud on the power of Congress under Article I to authorize the judges of our District Court to exercise the power conferred upon them by Section 31–101. On the contrary.

█ Its plenary legislative power over the District accordingly enables Congress to place upon the District Court, or, as here, its judges, responsibilities which may be beyond the competence of other Article III courts and which are comparable to the responsibilities a State may confer on her courts.

As stated by Mr. Justice Douglas, with the concurrence of Mr. Justice Black, in his dissenting opinion in Glidden Co. v. Zdanok, 370 U.S. 530, 590 n. 1, 82 S.Ct. 1459, 8 L.Ed.2d 671, in a respect consistent with the majority opinion in that case:

> The District Court of the District of Columbia, like the "inferior courts" established by Congress under Art. III, § 1, of the Constitution, is an Article III court (O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356), even though it possesses powers that Article III courts could not exercise. Congress, acting under its plenary power granted by Art. I, § 8, to legislate for the District of Columbia, has from time to time vested in the courts of the District administrative and even legislative powers. See, e. g., Keller v. Potomac Electric Co., 261 U.S. 428, 440–443, 43 S.Ct. 445, 447–448, 67 L.Ed. 731 (review of rate making); Postum Ce-

real Co. v. California Fig Nut Co., 272 U.S. 693, 698–701, 47 S.Ct. 284, 285–286, 71 L.Ed. 478 (patent and trademark appeals); Federal Radio Comm'n v. General Electric Co., 281 U.S. 464, 467–468, 50 S.Ct. 389, 390,. 74 L.Ed. 929 (review of radio station licensing; cf. Federal Radio Comm'n v. Nelson Bros. Co., 289 U.S. 266, 274–278, 53 S. Ct. 627, 631–633, 77 L.Ed. 1166). Congress has also authorized District Court judges to appoint members of the Board of Education. D.C.Code § 31–101.

We set forth in the margin illustrations of the scope of appointive authority conferred by the States on their courts and approved, from which it appears by the overwhelming weight of decision that such appointive power as is involved in Section 31–101 of our Code may be validly conferred by the States upon their courts.[7] It follows that Section 31–101 of our Code is a valid exercise of the legislative authority of Congress over this District, an authority commensurate with that which "a state may confer on her courts." O'Donoghue v. United States, supra 289 U.S. at 545–546, 53 S.Ct. at 748; National Mut. Ins. Co. v. Tidewater, supra 337 U.S. at 590, 69 S.Ct. 1173. Indeed, the special character of the District of Columbia, which has neither a local legislative body nor an elected local executive, argues for even greater discretion in Congress than is possessed by the States. That this may result in placing upon our District Court judges duties which other Article III courts may not perform would seem to be settled.

When first proposed in 1906 there was a debate in Congress as to the constitutionality of conferring upon the judges authority to appoint the members of the Board of Education; but the question was then resolved by Congress as we resolve it now when the long-standing provision is challenged for the first time in the courts.[8] Special reference was

**7.** State ex rel. Buttz v. Marion Circuit Court, 225 Ind. 7, 72 N.E.2d 225, 170 A.L.R. 187 (1947) (registration board); Newton v. Edwards, 203 Ark. 18, 155 S.W.2d 591 (1941) (tax collectors); State ex rel. School City of South Bend v. Thompson, 211 Ind. 267, 6 N.E.2d 710 (1937) (board of tax adjustment); People ex rel. Rusch v. White, 334 Ill. 465, 166 N.E. 100, 64 A.L.R. 1006 (1929) (election boards, Judges and clerks); Elliott v. McCrea, 23 Idaho 524, 130 P. 785 (1913) (drainage commissioners); Minsinger v. Rau, 236 Pa. 327, 84 A. 902 (1912) (board of public education); People v. Evans, 247 Ill. 547, 93 N.E. 388 (1910) (examining boards); City of Indianapolis v. State ex rel. Barnett, 172 Ind. 472, 132 N.E. 165 (1909) (appraisers); Ross v. Board of Chosen Freeholders of Essex County, 69 N.J. Law 291, 55 A. 310 (1903) (park commissioners); Citizens' Sav. Bank v. Town of Greenburgh, 173 N.Y. 215, 65 N.E. 978 (1903) (road commissioners); Cahill v. Perrine, 105 Ky. 531, 49 S.W. 344, 50 S.W. 19 (1899) (guards); City of Terre Haute v. Evansville & T. H. R. Co., 149 Ind. 174, 46 N.E. 77, 37 L.R.A. 189 (1897) (city commissioners); Fox v. McDonald, 101 Ala. 51, 13 So. 416, 21 L.R.A. 529 (1893) (board of police commissioners); State v. Mounts, 36 W.Va. 179, 14 S.E. 407, 15 L.R.A. 243 (1891) (jury commissioners); Staude v. Board of Election Commissioners, 61 Cal. 313 (1882) (en banc) (board of police commissioners); Russell v. Cooley, 69 Ga. 215 (1882) (board of registration and election managers); Hoke v. Field, 10 Bush 144, (73 Ky. 144) 19 Am.R. 58 (Ky.1874) (tax collector); Johnson v. De Hart, 9 Bush 640 (72 Ky. 640) (Ky.1873) (school commissioners). Cf., In re Dexter-Greenfield Drainage District, 21 N.M. 286, 154 P. 382 (1915) (drainage commissioners); Walker v. City of Cincinnati, 21 Ohio St. 14, 8 Am.Rep. 24 (1871) (trustees for railroad): And see 1 Cooley, Constitutional Limitations 213–21 (8th ed. 1927) and cases cited there. Contra, State ex rel. Young v. Brill, 100 Minn. 499, 111 N.W. 294, 639, 10 Ann.Cas. 425 (1907) (county board of control).

**8.** In the 59th Congress there were eight bills introduced in the House offering different plans for the reorganization of the school system of the District of Columbia. Extensive hearings were held. Hearings on the Several School Bills Relating to the Reorganization of the Schools of the District of Columbia Before a Subcommittee of the House Committee on the District of Columbia, 59th Cong., 1st Sess. (1906). The House committee reported a bill, H.R. 18442,

made to the Philadelphia plan, under which the legislature of the State had vested the appointive authority in a local court as follows:

> The controllers of the public schools of the first school district of Pennsylvania shall hereafter be appointed as follows, viz.: It shall be the duty of the judges of the court of common pleas for the city and county of Philadelphia, \* \* \* on or before the first day of December in each year, \* \* \* to appoint [fourteen] citizens of said district, to serve as controllers of the public schools of said district, for the term of three years \* \* \*.

Pa. Act of April 5, 1867, P.L. 779, § 1, as amended, Pa. Act of May 25, 1874, P.L. 228, 24 P.S. § 1964, 17 P.S. §§ 252, 253. Congress was impressed by the success of this state procedure, which had been in effect more than thirty years. The similar policy adopted by Congress in the enactment of Section 31–101 we think finds its validity in Article I of the Constitution.

### III.

■■ We could rest alone upon Article I, but Section 31–101 gains support also from Article II, § 2, cl. 2, of the Constitution. After providing that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law," clause 2 concludes with this provision,[9]

> but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

This was a deliberate decision by the Framers to enable Congress in its wisdom to authorize "the Courts of Law" to share with the executive the appointing power of federal officers.

Mr. Justice Story approved the provision in his Commentaries:

> The propriety of this discretionary power in Congress, to some extent, cannot well be questioned. If any discretion should be allowed, its limits could hardly admit of being exactly defined; and it might fairly be left to Congress to act according to the lights of experience. It is difficult to foresee or to provide for all the combinations of circumstances which might vary the right to appoint in such cases. In one age the appointment might be most proper in the President; and in another age, in a department.[10]

in which the Board of Education was to be appointed by the D.C. Commissioners. H.R.Rep. No. 3395, 59th Cong., 1st Sess. (1906). On the floor Congressman Foster of Vermont offered an amendment to have the District Court (then the Supreme Court of the District of Columbia) appoint the School Board. 40 Cong. Rec. 5754 (1906). This was modeled after the plan adopted in Philadelphia. General debate ensued. Id. at 5754–63. Some felt the Commissioners should retain the power, and it was also suggested that popular election would be best. Some would have given the power of appointment to the President, the Secretary of the Interior, or the Commissioner of Education.

The debate focused on whether appointment by the court was a proper allocation of functions within a municipal corporation. The proponents said it was and cited Philadelphia as an example of a municipal corporation which had adopted this plan and used it well. The opposition advanced a variety of reasons based on preferences for other alternatives. There was objection also that it would be a "bad precedent," and would violate the separation of powers. The amendment was adopted by the overwhelming vote of 113 to 38, Id. at 5763, and the plan thus initiated has since been retained by Congress. And see note 13, infra.

9. See Madison's Notes on the Federal Convention in Documents Illustrative of the Formation of the United States 682–83, 684, 733 (Tansill ed. 1927).

10. Story's use of the word "department" includes "the Courts of Law" which were placed on the same footing as "the President alone" and "the Heads of Departments." And see O'Donoghue v. United States, supra 289 U.S. at 530, 53 S.Ct.

2 Story, Commentaries on the Constitution of the United States 360–62 (5th ed. 1891). And see generally, United States v. Solomon, 216 F.Supp. 835, 838–843 (S.D.N.Y.), for a contemporary discussion of the allocation of the power of appointment among the three branches.

 Read literally, Article II, § 2, cl. 2, sustains the validity of Section 31–101.[11] The contention is made, however, that the provision is not to be read literally,[12] that In the Matter of Hennen, 38 U.S. (13 Pet.) 230, 10 L.Ed. 138, the Supreme Court construed the appointive power of "the Courts of Law" to include only officers related in some manner to the judicial function. In *Hennen* the United States District Court for the Eastern District of Louisiana had appointed a clerk of court. The language of the Court relied upon by plaintiffs is the following:

> The appointing power here designated, [Article II, § 2] in the latter part of the section, was, no doubt, intended to be exercised by the department of the government to which the officer to be appointed most appropriately belonged. The appointment of clerks of courts properly belongs to the courts of law; and that

a clerk is one of the inferior officers contemplated by this provision in the constitution cannot be questioned.

38 U.S. (13 Pet.) at 257–258.

This statement was not a decision by the Court that Congress could confer upon "the Courts of Law" the power to appoint only officers concerned with the administration of justice. Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717, explicitly refutes such an interpretation of *Hennen*. In *Siebold* the question was whether Congress could constitutionally confer upon the United States Circuit Court of that period (1879) authority to appoint supervisors of a congressional election. It was contended Congress could not do so since the duties of the supervisors were entirely executive in character. The Court answered:

> It is no doubt usual and proper to vest the appointment of inferior officers in that department of the government, executive or judicial, or in that particular executive department to which the duties of such officers appertain. But there is no absolute requirement to this effect in the Constitution; and, if there were, it would be difficult in many cases to determine to which department an office properly belonged. * * *

740 at 743. "The Constitution, in distributing the powers of government, creates three distinct and separate departments—the legislative, the executive, and the judicial." And see the same usage of "department" in Matter of Hennen, 38 U.S. (13 Pet.) 230, 257–58, 10 L.Ed. 138 (quoted infra), and in Ex parte Siebold, 100 U.S. 371, 397, 25 L.Ed. 717 (quoted infra).

11. Plaintiffs assert that the word "alone" followed by a dash, and then "in the Courts of Law, or in the Heads of Departments," as appears in George Mason's Notes on the Constitution, at 4 Farrand, Records of the Federal Convention of 1787, 60 (1937), suggests a pyramid that would allow the President to appoint in either the executive departments or the judiciary but would confine the appointing power of the "Courts of Law" and the "Heads of Departments" to their respective spheres. The Constitution in its final

form has "alone" followed by a comma, not a dash, so that if significance is to be attached to the punctuation it would seem to strengthen the view that the three departments are on a par one with the other, subject only to the discretion of Congress. And see Ex parte Siebold, 100 U.S. 371, 25 L.Ed. 717.

12. Of course in reading the Article literally we necessarily presuppose that it refers only to the federal establishment, but we do not construe "such inferior Officers, as they [the Congress] think proper" as identical with "Officers of the United States." United States v. Germaine, 99 U.S. 508, 509–510, 25 L.Ed. 482.

If a clerk of court is an "inferior Officer" within the meaning of Article II, § 2, cl. 2, it is difficult to exclude from this category members of the Board of Education, a body created by Act of Congress.

[A]s the Constitution stands, the selection of the appointing power, as between the functionaries named, is a matter resting in the discretion of Congress. And, looking at the subject in a practical light, it is perhaps better that it should rest there, than that the country should be harassed by the endless controversies to which a more specific direction on this subject might have given rise. The observation in the case of Hennen, to which reference is made (13 Pet. 258), that the appointing power in the clause referred to "was no doubt intended to be exercised by the department of the government to which the official to be appointed most appropriately belonged," was not intended to define the constitutional power of Congress in this regard, but rather to express the law or rule by which it should be governed. The cases in which the courts have declined to exercise certain duties imposed by Congress, stand upon a different consideration from that which applies in the present case. The law of 1792, which required the circuit courts to examine claims to revolutionary pensions, and the law of 1849, authorizing the district judge of Florida to examine and adjudicate up-

on claims for injuries suffered by the inhabitants of Florida from the American army in 1812, were rightfully held to impose upon the courts powers not judicial, and were, therefore, void. But the duty to appoint inferior officers, when required thereto by law, is a constitutional duty of the courts; and in the present case there is no such incongruity in the duty required as to excuse the courts from its performance, or to render their acts void.

100 U.S. at 397–398.

The court was authorized by the statute upheld in *Siebold* only to appoint the supervisors, not in any way to perform the function of supervision. So, too, in the present case, the District Judges are authorized by Section 31–101 to appoint the members of the Board,[13] not to administer the schools.[14] And see Russell v. Cooley, 69 Ga. 215.

In Glidden v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671, five of the seven Justices participating in the decision noted that the judges of our District Court selected the members of the Board of Education. The validity of this, though not in issue in the case, which involved the status of the Court of Claims and the Court of Customs and

13. In 1957, Congress added Section 31–101(b) to allow the Judges to remove a member of the Board after a public hearing on a complaint filed by the United States Attorney, or one of his assistants, "for adequate cause affecting his character and efficiency as a board member." This provision was added so that there would be some provision for removal. It was deemed most proper to vest this power in the body which appointed the member. H.R.Rep. No. 305, 85th Cong., 1st Sess. (1957); S.Rep. No. 330, 85th Cong., 1st Sess. (1957). It has been generally accepted that such power of removal is incidental to the power of appointment. Accord, e. g., In the Matter of Hennen, supra 38 U.S. at 259–260.

By its 1957 amendment of Section 31–101 Congress reaffirmed the action originally taken in 1906, imposing upon the judges the duty of appointing the members of the Board.

14. Were the judges authorized to administer the schools, even though our Dis-

trict Court is an Article I as well as an Article III court, there would have been "such incongruity in the duty required as to excuse the courts from its performance or to render their acts void." Ex parte Siebold, supra 100 U.S. at 398. "The law of 1792" referred to in *Siebold* would have required the circuit court to examine claims to revolutionary war pensions; and the law of 1849, also referred to in *Siebold*, attempted to authorize the District Judge of Florida to examine and adjudicate claims for injuries suffered by the inhabitants of Florida at the hands of the American army in 1812. Such functions, the Court said, were "rightfully" held unconstitutional. They sought to place upon the courts adjudicatory or decisional responsibilities in matters which were not "cases" or "controversies," to which the adjudicatory or decisional power of courts established under Article III is limited.

**914**

Patent Appeals, was not questioned. In the opinion of Mr. Justice Harlan, in which Mr. Justice Brennan and Mr. Justice Stewart joined, Article II, § 2, is referred to as the probable source of Section 31–101, and Ex parte Siebold, 100 U.S. at 397–398 is cited. 370 U.S. at 581 n. 54, 82 S.Ct. 1489. And see the dissenting opinion of Mr. Justice Douglas, in which Mr. Justice Black joined, 370 U.S. at 590 n. 1, 82 S.Ct. 1493, referred to in Part II, supra, of this opinion.

We are cited to no case, and we have found none, which holds invalid an Act of Congress conferring appointive power upon a court or the judges of a court. In a number of instances the power has been conferred in this jurisdiction. This is not conclusive on the issue of validity, but it demonstrates the deep-seated congressional view of the constitutional issue; and this is entitled to weight when the issue is before the courts. Our District Court has been authorized by Congress to appoint Jury Commissioners, D.C.Code § 11–1401, assumed to be valid in Collazo v. United States, 90 U.S.App.D.C. 241, 250, 196 F.2d 573, 582, cert. denied, 343 U.S. 968, 72 S.Ct. 1065, 96 L.Ed. 1364; and to appoint The Register of Wills, D.C. Code § 19–401. Its judges are authorized to appoint members of the District of Columbia Mental Health Commission, D.C.Code § 21–502. And our District Court, along with all other District Courts, is authorized to appoint and remove United States Commissioners, 28 U.S.C. § 631; and to appoint interim United States Attorneys, 28 U.S.C. § 506, United States v. Solomon, supra; and interim United States Marshals, 28 U.S.C. § 545. Authority is conferred upon the several Chief Judges of the Courts of the District to appoint the Board of Trustees of the Legal Aid Agency, D.C.Code § 2–2204.[15]

The above mentioned officials, appointed by the courts as pre-

scribed by Congress, may be thought to be concerned with the administration of justice. Even if this were altogether correct, it does not follow that Congress is so constrained in resorting for help to a court or its judges. Though the policy followed by Congress is indicated by the use it makes of its authority, Article II is couched in terms of discretion; and Congress has not considered it can empower judges to appoint only officers concerned with the administration of justice, as witness Section 31–101 itself, enacted sixty years ago, retained ever since, and legislatively reaffirmed in 1957, note 13, supra. That Congress has not construed its power so narrowly is further demonstrated by the legislation approved in Ex parte Siebold, supra 100 U.S. at 397–398. Moreover, the national legislative body has itself exercised appointive power in respects removed from the legislative function. Section 24 of the Act of 1871, 16 Stat. 419; Section 2–201, D.C.Code; and Section 2–1702, D.C.Code. It is interesting to note also that Congress by D.C.Code 23–401 has empowered the Chief Judge of the District Court to perform in extradition cases a function like that ordinarily performed by the governor of a state. The limitation which is referred to in *Siebold* is not an affirmative requirement that the duty of the officer be related to the administration of justice. It is a negative requirement that the duty may not have "such incongruity" with the judicial function as would void the power sought to be conferred. And when the Supreme Court suggested this test in *Siebold* it was concerned with an Article III court, whereas our judges may be clothed with broader powers through Article I. The "incongruity" limitation is a safeguard, should one be needed, to protect the governmental structure from legislative abuse. However, we suggest that it should be temperately used by the judiciary in passing upon the exercise by Congress of its legislative authority with respect to the

15. The validity of these appointive powers of course finds support not only in Article II, but also, in the local instances,

in the Article I plenary authority of Congress to legislate for the District of Columbia.

government of the District of Columbia. For reasons more fully explained in Part IV of this opinion there is no disabling "incongruity" here. The fact is that while the nature of an appointive power is executive, it has never been limited to the executive department of the government. See, again, Ex parte Siebold, supra 100 U.S. at 397, and the interesting discussion in the old case of Mayor and City Council of Baltimore v. State, 15 Md. 376, 455–461. The matter is stated as follows in United States v. Cooper, 20 D.C. (9 Mackey) 104, 124:

> * * * the power of appointment to office is not a function so intrinsically executive that it necessarily belongs to that department; although its nature is executive, whether it be exercised by a Court or by the Legislature or by the President. Mayor and City Council of Baltimore v. [Board of] Police [v. City of Baltimore] Board, 15 Md. 455.

The court in *Cooper* also refers to Story's views of the doctrine of separation, that it was to be understood "in a limited sense."

 There is no constitutional principle that federal judges may not engage officially in nonjudicial duties. There is the constitutional principle that Article III courts may not engage in adjudicatory or decisional functions except in those "cases" and "controversies" referred to in Article III. The first Chief Justice of the United States illustrated the distinction. He led the Court in declining to give advisory opinions to President Washington; but a few years later when still Chief Justice he saw no constitutional objection to becoming the American negotiator with England of the important Jay treaty which bears his name. This was not without controversy, albeit in good part politically motivated. The Jay experience is mentioned simply as an outstanding illustration of the difference between functions which may not be required of Article III courts or their judges and functions of a nonjudicial character which are not barred by the Constitution.

██ There are several limitations upon the duties which judges may be called upon to perform, aside from the "cases" or "controversies" limitation above referred to. There is a limitation based upon policy or propriety; there is also the limitation of "incongruity" referred to in *Ex parte Siebold*; and there is the constitutional limitation that the function be consistent with the "guaranties of personal liberty" referred to in *O'Donoghue*; but there is no constitutional limitation based simply upon the function being "non-judicial." In the present case the policy decision has been made by Congress. The "incongruity" problem is solved for the District of Columbia in the present case by the express grant to Congress of power to invest even Article III courts with authority to appoint "inferior Officers"; for whatever the scope of this power for other Article III courts, it plainly permits our District Court judges, clothed also with authority stemming from legislation under Article I, to accept the duties imposed by Section 31–101. And there is no invasion of the "guaranties of personal liberty" referred to in *O'Donoghue*—a subject we shall advert to more fully in discussing the due process issue.

 The doctrine of separation of powers, though essential to the nature of our constitutional system, is not set forth explicitly in the Constitution, as it is in the constitutions of some of the states. It is implied in the federal system. Largely for this reason its boundaries are not rigid or clearly ascertainable in all situations. See Ex parte Siebold, supra 100 U.S. at 397. To the extent the doctrine applies to the government of the District of Columbia it must take account of the plenary power of Congress to legislate for the seat of the national government. In the nation at large, by the express terms of Article 2, § 2, cl. 2, "the Courts of Law" may be authorized by Congress to make federal appointments which otherwise would be made by the Executive, or in some instances perhaps by Congress. Since a

substantial appointive power in the courts is thus explicitly authorized, even if its boundaries are not clear, it would seem necessarily to follow that the power conferred by Congress upon our District Court judges by Section 31–101, in the exercise of the fullest possible congressional power, does no violence to the separation doctrine.

■■■ Moreover, a matter otherwise within the competence of a court or judge is not removed therefrom by some political controversy growing out of its exercise,[16] and an occasional and perhaps exaggerated public complaint by one or two judges who find participation burdensome, is not a constitutional barrier, nor, indeed, can it be said to have been so intended. Nor can the validity of an appointing power be denied because an appointee in carrying out his own separate functions may become involved in controversy. The members of the Board may be held accountable under the law for the manner in which they perform their duties.

### IV.

■■■ We now discuss further the due process issue, although plaintiffs do not rely heavily upon this, and it was not referred to by Judge Wright in his opinion justifying his request for a three-judge court to consider the constitutional validity of Section 31–101. See Hobson v. Hansen, supra. The constitutional authority for the legislation, whether Article I alone or considered with Article II, is very persuasive, if not dispositive, on the due process issue. The contention is made, however, as we understand it, that the appointive power conferred upon the judges is violative of due process of law because litigation may arise before the District Court over the manner in which the Board administers the schools.

Initially we treat this problem as though the appointive power which may be exercised by "the Courts of Law" pursuant to Article II of the Constitution is limited, as plaintiffs contend, to inferior officers associated with the judicial department.[17] It has never been suggested and can hardly be contended that anyone is deprived of life, liberty, or property without due process of law merely because the official conduct of such an appointed officer might be questioned in a case or controversy in the court which appointed him. Congress does not violate the Due Process Clause by authorizing a District Court to appoint a clerk or deputy clerk of court, or an interim marshal or United States attorney, or members of the Mental Health Commission, or referees, or court reporter, notwithstanding their official conduct might become involved in litigation before the appointing court. If this invalidated legislation authorizing the courts to make such appointments, it would seem to follow, a fortiori, that a judge could not pass upon a case which challenged the official action of the official who appointed him—so to hold would cause a substantial part of our governmental structures to collapse.

■■■ A judge who has a substantial interest in or one of several specified personal connections with a case, must disqualify himself. 28 U.S.C. § 455. And if a litigant feels that a judge would have a personal bias or prejudice, he may have the judge disqualified by filing a "sufficient affidavit." 28 U.S.C. § 144. But the possibility of such instances arising does not affect the validity of Section 31–101.[18]

If Article II permits Congress to empower "the Courts of Law" to appoint officers whose official functions are not

---

16. This of course is so notwithstanding there may be rivalry, even a sort of political rivalry, as to who should be appointed. This may be said of the appointment of our Clerk, for example, or, in case of a vacancy, the appointment of the United States Attorney by the District Court, or the United States

Marshal, or members of the Mental Health Commission.

17. See Collins v. United States, 14 Ct.Cl. 568 (1878), decided before the decision of the Supreme Court in *Siebold*, supra.

18. In neither of the Supreme Court cases, *Hennen* and *Siebold*, involving the va-

associated with the courts—a construction which is in harmony with Congress' plenary power to legislate for the District under Article I—then the due process contention becomes even more tenuous. The administration of the schools is totally removed from the operation of our District Court. If in a case involving the action of a clerk of court, or members of the Mental Health Commission, or an interim United States attorney, as examples, a litigant is not deprived of due process by legislation authorizing the court or judges to appoint those officials, a fortiori there is no violation of due process by legislation empowering the court or judges to appoint members of the Board of Education whose duties are more remote from the court than those of the officials referred to. The due process contention of course gains no weight when it is remembered that the plenary legislative power of Congress over this District conferred by Article I is alone sufficient basis for Section 31–101.

 The applicable principles on the issue of due process were stated by the Supreme Court in In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 9℃ L.Ed. 942, as follows:

A fair trial in a fair tribunal is a basic requirement of due process. Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered. This Court has said, however, that "Every procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear, and true between the State and the accused denies the latter due

process of law." Tumey v. State of Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749. Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties. But to perform its high function in the best way "justice must satisfy the appearance of justice." Offutt v. United States, 348 U.S. 11, 14, 75 S.Ct. 11, 13, [99 L.Ed. 11].

In *Murchison* a judge had conducted contempt proceedings against two persons for having refused to answer questions the judge had put to them as witnesses in a "one man grand jury" which the same judge had conducted under state law:

It would be very strange if our system of law permitted a judge to act as a grand jury and then try the very persons accused as a result of his investigations.

349 U.S. at 137, 75 S.Ct. at 625.

In Tumey v. State of Ohio, referred to in *Murchison,* the official authorized to act had a pecuniary interest in the outcome; and in Offutt v. United States the Court pointed out that the judge had become so "personally embroiled" with defense counsel in the actual trial of the case and displayed such personal animosity that the contempt conviction by the judge had to be set aside, the matter to be tried by another judge.

Plaintiffs cite Cooley on the due process issue as follows:

[A] legislative act which should undertake to make a judge the arbiter in his own controversies would be void, because, though in form a provision for the exercise of judicial power, in substance it would be the creation of an arbitrary and irresponsible authority, neither legislative, executive, nor judicial, and wholly unknown to constitutional government.

lidity of congressional authority for judges to appoint an official, was there any question of inability, on due process

grounds, of the appointing judge to pass upon the validity of the action of the appointee after appointment.

918

1 Cooley, Constitutional Limitations 356 (8th ed. 1927).

As shown in 2 Cooley, op. cit. supra 870–71, the author had reference to a judge acting as such with respect to an estate of which he was executor, or in a case in which he has a pecuniary interest, or in which some personal right of his own was involved.

■ Nothing comparable to the problems which arose in any of the above situations has arisen by virtue of the enactment of Section 31–101, or by reason of appointments made thereunder. Plaintiffs do not assert that the existence of Section 31–101 and the fact of appointments under it have resulted in any denial to them of a fair and impartial tribunal in their present litigation. And in any future case which might involve the performance by members of the Board of their duties we may not presume that denial of due process would occur by reason of Section 31–101 and appointments made thereunder. Indeed, a judge before whom a case might come might have had nothing whatever to do with the appointments when they were made. But this aside, and assuming otherwise, the official act of participating in the selection of Board members does not in and of itself preclude on due process grounds the ability of the judge to decide fairly the merits of litigation challenging the validity of the performance by a Board member of his duties as such. If in a particular case such a challenge were made its soundness on due process grounds would depend on the circumstances bearing thereon and not on the mere fact that the judge had performed the duty reposed upon him by Congress in Section 31–101.

Public discussion from time to time over the merits of appointees, or of those considered for appointment, may place the judges in an unenviable position, and increase the unwelcomeness of their responsibility. But this falls far short of necessitating a constitutional ruling that by appointing members of the Board the judges have deprived or will deprive any persons in the situation of plaintiffs of a fair and impartial tribunal.

■ Time and circumstances may well argue now for a better plan; but this is a matter of legislative policy committed to Congress. O'Donoghue v. United States, 289 U.S. at 553, 53 S.Ct. at 751 (opinion of Chief Justice Hughes, Mr. Justice Van Devanter and Mr. Justice Cardozo). As is well known much consideration is being given by Congress and others to a new plan for the entire governmental structure of the national capital.

■ We are not to decide whether Congress has here acted wisely, but whether the judgment it has exercised resides within its competence. In the absence of a fuller measure of self-government in this District, Congress reasonably could turn to men with those qualities Congress believed were probably possessed by independent judges, chosen by the President and confirmed in office by the Senate. The appeal for a better solution we think must also be to Congress, not to the Constitution.

■ We are concerned in this opinion with an affirmative constitutional grant of governmental authority to Congress. The grant should not be narrowly construed. The Supreme Court has said its exercise is subject only "to the guaranties of personal liberty in the amendments and in the original Constitution." O'Donoghue v. United States, supra at 545, 53 S.Ct. at 748. None of these guaranties is infringed by Section 31–101, or by the exercise of the power therein conferred. Whether or not the schools are administered by members of the Board consistently with the guaranties of personal liberty is another matter, as it would be were the members of the Board required to be appointed or selected by some other method.

We cannot bring ourselves to the view that the exercise by the judges of their responsibility under Section 31–101 deprives the District Court of the ability impartially to decide any statutory or

constitutional issues presented by any litigant in connection with the performance by members of the Board of their responsibilities, or that if any judge feels unable to do so he or she will fail to step aside.

We conclude that Section 31–101 finds constitutional validity (1) in the plenary legislative power with respect to the District of Columbia vested in Congress by Article I of the Constitution, (2) in the power vested in Congress by Article II of the Constitution, permitting the courts to appoint inferior officers,[19] and, further, (3) in a combination of these two powers, that is, the Article II power of appointment, even if circumscribed when exercised by courts established only pursuant to Article III, is freed here of such restrictions by the plenary Article I legislative power of Congress with respect to the District of Columbia, and, thus freed, encompasses Section 31–101.

The motion of plaintiffs for summary judgment is denied, and the motion of defendant Judges to dismiss is granted as to Count 1 of the complaint.

J. SKELLY WRIGHT, Circuit Judge (dissenting):

The majority of this three-judge court has decided that 31 D.C.Code, § 101 (1961) is sustained alternatively by the District clause of Article I and the appointments provisions of Article II of the Constitution. I cannot agree. Ordinarily, nullifying an Act of Congress as unconstitutional is a drastic venture. But the institutional considerations which persuade courts to show restraint when asked to intervene in the affairs of the other branches of government largely disappear when the statute under review is one assigning responsibilities to the judiciary; and all agree that a federal court's first duty is to guard zealously against impairment of its own integrity as an institution. See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803). The majority ignores these precepts. Today is the first time a court has ever held that Congress may impose on this or any other federal court a duty so totally unrelated to the judicial function. And indicators clearly show that § 101 poses a real threat to this court's integrity.

I

Actually, Article II, § 2, cl. 2, which, of course, applies to all federal courts, has no immediate bearing on the question presented by this suit, since members of District of Columbia boards are not "Officers of the United States" within the sense of that Article.[1] If they were, the modes of their appointment would be rigidly limited to the alternative courses charted in Article II. But present and past practice are sprinkled with instances in which District officials have been

---

19. Even were a restricted construction given to the Article II appointive power of "the Courts of Law" such a construction would not affect the plenary legislative power over this District vested in Congress by Article I.

Congress could not confer upon a District Court in Maryland authority to appoint a school board for Maryland, for Congress has no authority to set up a Maryland school board. It has authority to create a school board in this District, and there are "courts" here upon which the appointive power may be conferred under Article II, as well as under Article I.

1. Article II, § 2, cl. 2 reads:
 " * * * and he [the President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments."

 "[A]ll other Officers of the United States" is the apparent antecedent of "such inferior Officers," the phrase in the passage at the end of the clause on which the court relies.

chosen by processes alien to Article II.[2] The language of Article II has never been taken as straining toward comprehensive coverage; by traditional construction, ordinary minor federal employees—clerks, inspectors, even lawyers—are excluded from "Officers," at least when Congress is silent.[3] And that language is hospitable to a distinction between officers of the nation and of the nation's capital city.

Because District of Columbia officials do not qualify as "Officers of the United States," Article II cannot justify § 101. Nevertheless, if Article II does authorize federal courts generally, at Congress' behest, to appoint inferior federal officials in other than the judicial branch, it would seem unreasonable to hold that federal courts here have lesser powers with respect to the appointment of officers of local District government. In this way, the court's expansive reading of Article II might influence the dimensions of Congress' power over federal courts in the District. I deal, therefore, with the court's construction of that Article.

Article II unquestionably empowers Congress to confide in the courts control over the appointment of ancillary officials in the judicial branch. However, § 101 concerns a board of education, a body which the court concedes is "totally removed" from the judiciary. If, as the court contends, Article II sustains § 101 quite independently of Article I, it would equally validate the conferral of similar appointment powers upon federal district courts outside the District; hypothetically, these courts could be instructed to nominate the board of directors of a local Community Action Agency or Project Head Start operating under Title II of the Economic Opportunity Act.[4] 78 Stat. 516, 42 U.S.C. §§ 2781–2791 (1964), as amended. In like manner the majority's logic would impel it to affirm not only § 101 but a statute obliging a federal court of appeals, for example, to appoint board members of a federal administrative agency, or one fastening comparable appointive duties on the Supreme Court itself.

The court must shoulder the burden of defending with convincing arguments a constitutional construction so instinctively hostile to American constitutional tradition. In my judgment, its arguments fall very short of this mark. There is no problem, first, in escaping

---

2. E. g., 2 D.C.Code § 201 (1961) (two members of District Anatomical Board to be picked by Surgeons General of Army and Navy); § 1702 (chairmen of District committees in Senate and House to appoint one member of District Armory Board); Act of 1812, ch. 75, § 3, 2 Stat. 721, in D.C.Code pp. xxix–xxxi (1961) (District mayor to be selected by board of aldermen and board of common council); Act of 1802, ch. 53, § 2, 2 Stat. 195, in D.C.Code pp. xxviii–xxix (1961) (public election of city council). See District of Columbia v. John R. Thompson Co., 346 U.S. 100, 104–110, 73 S.Ct. 1007, 97 L.Ed. 1480 (1953) (home rule constitutional).

3. Compare Burnap v. United States, 252 U.S. 512, 40 S.Ct. 374, 64 L.Ed. 692 (1920), and United States ex rel. Crow v. Mitchell, 67 App.D.C. 61, 89 F.2d 805 (1937), with Ex parte Siebold, 100 U.S. (10 Otto) 371, 25 L.Ed. 717 (1880).

4. The majority grants that Article II could not authorize Congress to assign courts tasks that are "incongruous" with the judicial function. But then it appears to decide that duties of appointment, as opposed to the administrative tasks committed to the appointees, never are "incongruous." In this connection it should be noted that § 101(b) provides for removal of school board members by the court, and under § 101(a), of course, the appointees may or may not be reappointed.

The court's opinion does not find or rely on any triviality in the stature or responsibilities of the Board of Education, the body whose members this court appoints under § 101. The general language of Article II renders such a distinction of dubious relevance. And the finding could not rightly be made in this case. Education is "perhaps the most important function of state and local governments," Brown v. Board of Education, 347 U.S. 483, 493, 74 S.Ct. 686, 98 L.Ed. 873 (1954); the power to control the character of the school board is a lever to affect the community profoundly.

from the "literal" reading of Article II, for it is simply not true that Article II ·expresses any meaning quite so clear. Its language very naturally admits the common-sense reading that courts of law and the other listed offices were meant to appoint only those officers "inferior" to them. This was the meaning recently attributed to "inferior" by a leading student of the Constitution. CORWIN, THE PRESIDENT: OFFICE and POWERS 1787– 1957 75–76 (4th ed. 1957). *See also* Collins v. United States, 14 Ct.Cl. 568, 574 (1878). No one would dispute, for example, that Article II contemplates that Congress may permit a Secretary to appoint only his own assistants,[5] not the personnel of any of the other executive departments. And the narrower reading harmonizes with the most apparent purpose of Article II: to let Congress clothe Secretaries and courts with the necessary authority for filling vacancies in their ·own staffs.

To support its Article II position, the ·majority next relies on language in one Supreme Court opinion, Ex parte Siebold, 100 U.S. (10 Otto) 371, 25 L.Ed. ·717 (1880). In Matter of Hennen, 38 U.S. (13 Pet.) 230, 257–258, 10 L.Ed. 138 (1839), the Court upheld the appointment by a district court of a clerk of court under Article II, saying that

"the appointing power * * * was no doubt intended to be exercised by the department of the government to which the officer to be appointed most appropriately belonged." Subsequently, in *Siebold*, the Court approved a statutory arrangement requiring the appointment of federal election supervisors by the circuit courts.[6] The Court went on, however, to comment in somewhat puzzling language that *Hennen* had correctly expressed "the law or rule by which it [Congress] should be governed," under Article II, and then volunteered that "in the present case there is no such incongruity in the duty required as to excuse the courts from its performance, or to render their acts void." 100 U.S. at 398. For reasons developed more fully hereinafter, this court's assigned duties under § 101 are incongruous with its Article III status, since § 101 in practical effect relegates District citizens with constitutional grievances against the Board to this court whose judges appoint the Board. Moreover, conflicting and ambiguous language in 19th century cases should not preclude this court from making its independent evaluation of Article II, with the guidance of those cognate doctrines whose print is felt throughout our constitutional structure.

5. Since Congress has not granted these permissions, the immediate subordinates of Department Secretaries are now all appointed pursuant to the general provision of Article II: that is, by the President with the advice and consent of the Senate.

·6. Under the amendments to the Enforcement Act, 16 STAT. 433 (1871), REV. ST.\T. Tit. XXVI (1875), these supervisors were to do no more than witness congressional elections to find out whether voting qualifications were evenhandedly applied. Apparently they were then to report irregularities to the House of Representatives, for use as evidence if the House were requested to exercise its constitutional responsibility of judging the outcome of congressional elections. U.S.Const., Art. I, § 5, cl. 1. When the House so sits to judge elections, it exercises a function which is ·characteristically judicial; its proce-

dures, then and now, contemplate the submission of complaint and answer and provide opportunity to secure depositions, Act of Feb. 19, 1851, ch. XI, 9 STAT. 568, as amended, 2 U.S.C. §§ 201– 226 (1964); and it is expected to make findings of fact and apply rules of law. *See* Scharpf, *Judicial Review and the Political Question—A Functional Analysis*, 75 *Yale L.J.* 517, 539–540 (1966). The Enforcement Act itself gave circuit courts jurisdiction to count ballots and declare the winners in state and municipal elections contaminated by alleged deprivations of the right to vote on account of race. Section 23, ch. CXIV, 16 Stat. 146 (1870), the progenitor of 28 U.S.C. § 1344 (1964). The supervisors were, then, auxiliary to the administration of justice. Certainly they had no legislative or administrative responsibility for developing policy.

Congress repealed the supervisors provisions in 1894. 28 STAT. 36.

Finally, the court cites statutes purportedly establishing a deeply sensed present congressional understanding that the boundaries of Article II are those it now identifies. But its citations singularly fail to uncover any such congressional practice. All but two of the cited enactments merely authorize judicial appointment of court-related personnel,[7] and Article II sanctions these appointments by any reading. The exceptions, of course, are the statute in *Siebold*, repealed in 1894, and § 101. To advance § 101 as manifesting an ingrained congressional view that statutes like § 101 are constitutional is a wondrous instance of bootstrapping.

Rather, if historic congressional practice is germane to the constitutional question, it impressively supports the narrower construction of Article II; for, apart from § 101 and passing by the supervisors with moot status in *Siebold,* we are cited no instances, past or present, in which Congress found it necessary or proper to impose on federal courts the responsibility for appointing federal officials whose duties are unconnected with the judicial function. This tradition in Congress is in exact harmony with the insistent doctrine of our law, articulated by Article III and constitutional history, that the federal judiciary refrain from indulging in nonjudicial activities. This doctrine and the policies encircling it should be instrumental in resolving whatever ambiguity inheres in Article II.

Under Article III of the Constitution federal courts are by implication permitted to engage only in that business which is "judicial," [8] and only in judicial matters which become incarnated in what the Constitution calls "cases or controversies." The Constitutional Convention arrived at this pristine and scrupulous settlement only after deliberating on, but rejecting in the end, proposals which would have associated federal judges with the Legislative and Executive Branches, or obligated the Supreme Court to file advisory opinions upon due request.[9] Shortly afterward, in a celebrated encounter in 1793, Chief Justice Jay's Supreme Court politely spurned President Washington's request that it enlighten the nation by rendering an advisory interpretation of provisions in treaties between the United States and France.[10]

The judicial elaboration since then of the particular restraints latent in the broad negative commandments of Article III is revealing if familiar history. If judicial resolution of a case will be subject to revision or kindred subsequent action by the Legislature or Executive,

---

7. Even the Commission on Mental Health, appointed by the District Court under 21 D.C.Code § 308 (1961), is clearly enough a servant of the court. Its statutory responsibility is to "make reports and recommendations to the court as to the necessity of treatment * * * of * * * insane persons," and it is to act "under the direction of the equity court." As the Court of Appeals said in De Marcos v. Overholser, 78 U.S.App.D.C. 131, 132, 137 F.2d 698, 699 (1943): "The statute * * * was passed in 1938 in recognition of the fact that the assistance of unbiased experts was essential to assist courts in dealing with insanity cases."

8. At several points the court's opinion seemingly denies this limitation, hinting instead that, while the "case or controversy" requirement modifies their powers to act judicially, federal courts remain somewhat free to accept responsibilities that are entirely non-adjudicative in nature. This suggestion, if intended, is heresy, unsupported by anything in history, case law, or the commentaries. It would be a very great anomaly if courts' powers to accept tasks *increased* as the tasks became *decreasingly* judicial. And were the majority prepared fully to embrace this thesis, its discussion of Articles I and II would be superfluous; § 101 is unquestionably non-adjudicative.

9. *See* the accounts in HUGHES, THE SUPREME COURT OF THE UNITED STATES, 27–29 (1928), *and* HART & WECHSLER, THE FEDERAL COURTS AND THE FEDERAL SYSTEM 13–14 (1953).

10. *See* the source materials collected in HART & WECHSLER, *op. cit. supra* Note 9, at 75–77, *and* the accounts in 1 WARREN, THE SUPREME COURT IN UNITED STATES HISTORY 108–111 (1922), *and* HAINES, THE ROLE OF THE SUPREME COURT IN AMERICAN GOVERNMENT AND POLITICS 1789–1835 143–145 (1944).

the federal court must stay its hand[11]; it is similarly bound to abstain from adjudicating lawsuits which for any reason lack an authentically adversary character[12]; and the issues presented must not only assume legal dress but must be susceptible to resolution by judicial methods rather than by the considerably freer choice between competing policies which characterizes legislative and administrative decision-making.[13]

While this cluster of restrictions undoubtedly reflects a variety of constitutional policies, common threads run through them all. One is that attention to extrajudicial activities is an unwanted diversion from what ought to be the judge's exclusive focus and commitment: deciding cases. Another is that, inasmuch as the judicial method is inappropriate for coping with nonjudicial issues, federal judges have no special competence for disposing of them. Since these issues involve democratic choice, it is politically illegitimate to assign them to the federal judiciary, which is neither responsive nor responsible to the public will. Moreover, it misleads the public

to camouflage the legislative character of a social decision and shore up its acceptability by committing it to the judiciary, thereby cashing in on the judicial reputation. Most critically, public confidence in the judiciary is indispensable to the operation of the rule of law; yet this quality is placed in risk whenever judges step outside the courtroom into the vortex of political activity. Judges should be saved "from the entanglements, at times the partisan suspicions, so often the result of other and conflicting duties."[14]

These considerations apply with more than usual force to § 101. The duties it imposes periodically result in a serious drain upon the available work time of district judges.[15] In weighing appointments to the School Board the District Court has frequently been beleaguered by the appeals of civic groups lobbying for or against candidates, or espousing standards for the court to apply in making appointments[16]; the committee of the District Court judiciary which screens nominees has sometimes actively solicited recommendations.[17] The court

---

11. Hayburn's Case, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792); United States v. Ferreira, 54 U.S. (13 How.) 40, 14 L.Ed. 42 (1852).

12. United States v. Johnson, 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943) (feigned case); St. Pierre v. United States, 319 U.S. 41, 63 S.Ct. 910, 87 L.Ed. 1199 (1943) (mootness); Muskrat v. United States, 219 U.S. 346, 31 S.Ct. 250, 55 L.Ed. 246 (1911).

13. Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 29 S.Ct. 67, 53 L.Ed. 150 (1908); see WRIGHT, FEDERAL COURTS § 15 (1963).

14. Matter of Richardson, 247 N.Y. 401, 420, 160 N.E. 655, 661 (1928) (Cardozo, C. J.).

15. At a hearing before the Legislative-Judiciary Subcommittee of the House in 1953, the Director of the Administrative Office of the U. S. Courts was asked why Chief Judge Bolitha J. Laws needed a $10,000-a-year administrative officer. He answered that "such duties as selecting school board members 'take an appreciable amount of time of Judge Laws.'" Washington Post, June 14,

1953, p. 1-A, col. 6. In 1956 Judge James R. Kirkland, head of the committee which reviewed nominations, was quoted as saying: "I spend more time on school business than judicial * * * and sometimes I wonder if the taxpayer is getting his money's worth." Washington Post, Feb. 12, 1956, p. E-2, col. 2.

16. Washington Post news stories reveal that the following groups have cast their influence: Federation of Civic Associations (June 26, 1949, p. 15-M, col. 8); League of Women Voters (April 15, 1962, p. 1-B, col. 7); N.A.A.C.P. (Feb. 6, 1954, p. 15, col. 8); District Congress of Parents and Teachers (March 7, 1956, p. 14, col. 3); Americans for Democratic Action (May 16, 1957, p. B-2. col. 2); Urban League and Central Northwest Citizens Association (June 10, 1962, p. B-4, col. 1). Other groups reported to have taken public positions include the Congress Heights Citizens Association, the Greater Washington Central Labor Council, the Fort DuPont Civil Association, and the Northwest Boundary Civic Association.

17. Washington Post, Feb. 29, 1956, p. 15, col. 3; April 22, 1957, p. B-2, col. 2.

has been the subject of editorial commendation and rebuke, depending on the papers' estimation of the qualifications of the appointees, and those of the judges to serve as public school overseers.[18]

The issues with which the judges have necessarily become involved in selecting board members are highly charged with political emotion. The race issue, for one, has cropped up in widely variant contexts: whether, in the years before 1954, District schools should remain segregated[19]; the pace of desegregation after the Supreme Court's decision in Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)[20]; the racial composition of the School Board itself[21]; and, especially in recent years, the racial impact of policies not ostensibly motivated by discriminatory considerations.

Apart from race, public education is today riven by keen debate about priorities and techniques. Should youngsters be taught to read phonetically or by the instant appreciation of entire words and phrases?[22] Should schools in lower class neighorhoods seek mainly to implant vocational skills or instead endeavor to confer a traditional general education?[23] What mixture of academic and practical qualifications should public schools exact from those seeking initiation into the teaching profession?[24]

These are samples of the questions which perplex educators and can ultimately determine the quality of our national life. If selection of the Board of Education is to be a responsible act, the agency charged with appointment must inform itself of the positions of the many candidates on the various questions of educational policy and at least begin to make its own decisions on where educational wisdom lies.

Those hazards inhering in judicial acceptance of extrajudicial occupations have then been realized quite fully within the District Court's experience under § 101. In some measure, further, the hazards will recur whenever federal courts are told to appoint government administrators whose work is not connected with the judiciary; and, while the measure may vary, the evils will seldom be *de minimis*.

Avoidable constitutional construction entailing so widespread a sacrifice of Article III principles should not be undertaken unless the practical considerations in its favor are quite compelling. The reason advanced in *Siebold, supra*, explaining its treatment of Article II, is that the difficulty in classifying particular positions as within or outside the judiciary would trouble Congress and the courts were the narrower construction

18. *E. g.*, Washington Post, June 12, 1951, p. 10, col. 1; Dec. 5, 1951, p. 14, col. 1 (judges' selections "have worked out lamentably in recent years"); June 7, 1952, p. 4, col. 1; Oct. 6, 1952, p. 10, col. 2; Oct. 20, 1952, p. 8, col. 2; April 4, 1954, p. 4–B, col. 1; June 28, 1956, p. 14, col. 1; June 20, 1962, p. A–16, col. 2; April 9, 1966, p. A–10, col. 1.

19. In 1949 the District Court judges declined to reappoint an outspoken opponent of segregation, and nominated instead another Negro who, while he was against segregation, felt that desegregation "takes a matter of education to bring about." Washington Post, June 28, 1949, p. B–1, col. 2.

20. For an account of the Board's consideration of a policy of gradual desegregation, and the public clamor stirred by its ultimate decision to integrate as rapidly as possible, *see* HANSEN, MIRACLE OF SOCIAL ADJUSTMENT: DESEGREGATION

IN THE WASHINGTON, D. C. SCHOOLS 43–54 (1957).

21. In 1962 Negro groups petitioned the judges for greater representation on the Board. See Washington Post, June 10, 1962, p. B–4, col. 1.

22. *See* DEBOER & DALLIMAN, THE TEACHING OF READING ch. 6A (rev. ed. 1964); MAZURKIEWICZ (ed.), NEW PERSPECTIVES IN READING INSTRUCTION (1964); GANS, FACT AND FICTION ABOUT PHONICS (1964).

23. *Compare* CONANT, SLUMS AND SUBURBS ch. 2 (1961), *with* RICKOVER, EDUCATION AND FREEDOM (1959); *see generally* BRAUNER & BURNS, PROBLEMS IN EDUCATION AND PHILOSOPHY (1965).

24. *See* CONANT, THE EDUCATION OF AMERICAN TEACHERS (1963); KOERNER, THE MISEDUCATION OF AMERICAN TEACHERS (1963); MAYER, THE SCHOOLS ch. 19 (1961).

embraced. 100 U.S. at 397, 398. But surely there is room for deference to the congressional judgment on individual situations; and if Congress concludes that it is debatable whether an officer is in the judiciary or in an executive department, under Article II it can allowably commit the power of appointing him to either one.

In elaborating its Article II argument, the court places repeated reliance on the fact that § 101 confides duties in the "judges," not the court itself. There is a rather uneasy tradition indicating that judges may take on extrajudicial public responsibilities. See Hayburn's Case, 2 U.S. (2 Dall.) 409, 1 L.Ed. 436 (1792); United States v. Todd, 54 U.S. (13 How.) 52, 14 L.Ed. 47 (1794). That practice has come under congressional fire[25] and stands now in disfavor; it is widely felt that a federal judge should abstain from accepting such assignments except in situations of pressing public need. In any event, these assignments run to one or two individual judges, not to the court as a whole; to the man, not the office; and they are without effect unless the judge personally consents. The practice, therefore, provides no help at all for § 101, which imposes upon the court as a collective unit a continuing obligation to act officially. To let constitutionality turn on the fact that Congress said "judges" rather than "court" would attach critical significance to a trivial detail of draftsmanship. Lastly, were the "judges" argument sound, by its nature it would have a life of its own. I can discern no logic specially tying or limiting it to Article II, or for that matter Article I. Alone, then, it would legitimate § 101, as well as other provisions assigning varieties of non-adjudicative responsibilities to regular federal court judges.

For all these reasons, my conclusion is that Article II permits Congress to require a federal court to appoint only personnel meaningfully affiliated with the judiciary. Therefore, it affords no basis for § 101.

## II

The other justification tendered in support of § 101 is Article I, § 8, cl. 17 of the Constitution, affirming congressional authority "to exercise exclusive legislation" over the District of Columbia. Pursuant to this authorization, Congress has created courts of limited jurisdiction to handle civil, criminal and juvenile cases arising under the District of Columbia common law and code; their judges serve for terms of ten years.[26] These are prototypes of "legislative courts"—established by Congress under discrete items of Article I legislative authority and free from the jurisdictional strictures of Article III.

The United States District Court and the United States Court of Appeals for the District of Columbia have a different stature and function. While endowed with special competence over certain classes of significant local cases,[27] they are invested as well with the entire jurisdictional spectrum enjoyed by federal trial and appellate courts elsewhere: "The parallelism * * * is complete." F. T. C. v. Klesner, 274 U.S. 145, 156, 47 S.Ct. 557, 71 L.Ed. 972 (1927). The question presented here is whether Congress may assign to this federal court the task of appointing a school board for the District. That question turns, to some extent at least, on whether this court is legislative under Article I or

---

25. *See* House Judiciary Comm. Report on the Use of Judges in Nonjudicial Offices in the Federal Government, S.Exec.Rep. No. 7, 80th Cong., 1st Sess. (1947).

26. Jurisdiction: 11 D.C.CODE §§ 741–742 (Supp. V 1966) (D.C. Court of Appeals); §§ 961–963, 1141, 1341 (Court of General Sessions); §§ 1551–1557 (Juvenile Court).
 Term of Office: 11 D.C.CODE § 702(c)

(Supp. V 1966) (D.C. Court of Appeals); § 902(c) (Court of General Sessions); § 1502(c) (Juvenile Court).

27. See 11 D.C.CODE §§ 321(a), 521 (as qualified by § 961(a)), and 522 (Supp. V 1966). By congressional designation the Supreme Court is also a superior court for the District of Columbia. 11 D.C.CODE § 101(2) (Supp. V 1966).

constitutional under Article III, or both—a subject of much litigation and conflicting jurisprudence.[28]

Initially the Court of Appeals for this Circuit concluded that this District Court, having been established under Article III, was thereby incapacitated from functioning administratively. In re Macfarland, 30 App.D.C. 365 (1908), *appeal dismissed*, 215 U.S. 614, 30 S.Ct. 402, 54 L.Ed. 349 (1909.[29] Later, however, within the space of seven years, the Supreme court thrice indicated that the federal courts in the District for jurisdictional purposes were organized as legislative courts. Keller v. Potomac Electric Power Co., 261 U.S. 428, 43 S.Ct. 445, 67 L.Ed. 731 (1923); Postum Cereal Co. v. California Fig Nut Co., 272 U.S. 693, 47 S.Ct. 284, 71 L.Ed. 478 (1927); Federal Radio Comm'n v. General Electric Co., 281 U.S. 464, 50 S.Ct. 389, 74 L.Ed. 969 (1930).[30] In none of these cases, all involving review of administrative proceedings, was the approved statutory jurisdiction so blatantly unjudicial in substance and form as that contemplated by § 101.[31] Even so, the Court justified its rulings only on the thesis that the District of Columbia courts were unaffected by Article III. *See General Electric, supra*, 281 U.S. at 468, 50 S.Ct. 389; Ex parte Bakelite Corp., 279 U.S. 438, 460, 49 S.Ct. 411, 73 L.Ed. 789 (1929).

Then, only three years after the *General Electric* case, the Court dramatically changed direction. In O'Donoghue v. United States, 289 U.S. 516, 53 S.Ct. 740, 77 L.Ed. 1356 (1933), it held that the United States courts in the District were Article III courts whose judges were due the salary and tenure protections that Article affords. Having gone so far, the Court declined to reverse *Keller* and its progeny completely, saying instead it would acquiesce in continued Article I jurisdiction for District federal courts, on the theory they were able to receive jurisdiction at the same time from Ar-

---

**28.** See Notes, 58 Nw.U.L.Rev. 401 (1964); 38 N.Y.U.L.Rev. 302 (1963); 71 Yale L.J. 979 (1962); 62 Colum.L.Rev. 132, 139–142, 151–154 (1962); Casenotes, 76 Harv.L.Rev. 160 (1962); 47 Harv.L.Rev. 133 (1933).

**29.** *Macfarland* overturned dictum in Moss v. United States, 23 App.D.C. 475 (1904). The consensus of the text-writers prior to the brace of decisions in the 1920's was that United States courts in the District were created solely under Article III. *E. g.*, Burdick, The Law of the American Constitution 92 (1922); Dodd, Government of the District of Columbia 136 (1909).

**30.** The holding in each of these three cases was only that Article III barred ultimate review of the appellate decisions in the Supreme Court. Technically, then, the Court's discussions of D.C. court jurisdiction were only dicta; however, in *General Electric* the Court, while dismissing the appeal, let stand an appellate decision which had rewritten a Commission order. *Compare* Brownlow v. Schwartz, 261 U.S. 216, 43 S.Ct. 263, 67 L.Ed. 620 (1923).

**31.** *Keller, supra*, involved revision by the District Court of valuations set by the D. C. Public Utilities Commission; assessing the value of property is a func-

tion courts regularly perform in tort, contract and eminent domain litigation. Review of interference proceedings begun in the Patent Office, called into question in *Postum, supra*, was perfectly judicial except for an asserted lack of *res judicata* for the appellate decision. And a later Court opinion has practically confessed that the characterization of this jurisdiction as nonjudicial was error. Glidden Co. v. Zdanok, 370 U.S. 530, 576, 82 S.Ct. 1459, 1501 (1962); *see id.* at 605 n. 11, 8 L.Ed.2d 671 (Douglas, J., dissenting). *General Electric, supra*, concerned review of the F.R.C.'s refusal to renew a radio station license; license renewal raises issues so adjudicative in nature that even agencies are usually required to afford the license-holder a trial-type hearing. *E. g.*, Columbia Auto Loan, Inc. v. Jordan, 90 U.S.App.D.C. 222, 196 F.2d 568 (1952). In each of these situations identifiable and adverse parties would appear in court flanked by lawyers who would argue from the evidence; the judicial structure of a proceeding, while not conclusive, Prentis v. Atlantic Coast Line Co., 211 U.S. 210, 226–228, 29 S.Ct. 67, 53 L.Ed. 150 (1908), usually verifies that it embodies a case or controversy. Tutun v. United States, 270 U.S. 568, 577, 46 S.Ct. 425, 70 L.Ed. 738 (1926).

ticle III and the District clause of Article I.[32]

This hybrid jurisdiction dictum marked a clear departure from prior law, which had been pervaded by the unquestioned assumption that Articles I and III were mutually exclusive sources of federal judicial authority[33]; it was vigorously opposed in *O'Donoghue* itself by Chief Justice Hughes and Justices Van Devanter and Cardozo, dissenting, whose position was that "[i]f the limitations relating to courts established under § 1 of Article III applied to courts of the District of Columbia, they would necessarily prevent the attaching to the latter courts of jurisdiction and powers of an administrative sort." 289 U.S. at 552–553, 53 S.Ct. at 751. And the dictum has remained entirely hypothetical; in the 33 years since its announcement not once has it been utilized to uphold any specific assignment of administrative business to a federal court in the District, or elsewhere.[34]

Only two cases raising legislative court issues have come before the Supreme Court since *O'Donoghue* was decided; their cumulative effect has been to cut away its dictum's sustaining logic. In National Mutual Ins. Co. v. Tidewater Transfer Co.,[35] first of these, the majority of the Court qualified the doctrine which provided the exclusive buttress for the hybrid jurisdiction notion.[36] In *O'Donoghue* Mr. Justice Sutherland had said that Congress' plenary powers to legislate for the District justified its clothing an Article III court with ex-

**32.** This logic immediately threatened the viability of at least *General Electric.* Article I jurisdiction under *O'Donoghue* can apparently be acquired only if it relates to congressional management of the District; but the jurisdiction assigned in that case fit, to the contrary, into a scheme of nationwide economic regulation. *See* Glidden Co. v. Zdanok, 370 U.S. 530, 580 & n. 53, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962) (Harlan, J.). It would be offensive, for example, if Congress could draw from the United States Court of Appeals here an advisory opinion on the constitutionality of proposed national legislation.

**33.** See American Ins. Co. v. Canter, 26 U.S. (1 Pet.) 511, 7 L.Ed. 242 (1828); Katz, *Federal Legislative Courts*, 43 HARV.L.REV. 894 (1930).

**34.** *Compare* Lurk v. United States, 111 U.S.App.D.C. 238, 296 F.2d 360 (1961), *affirmed on other grounds, sub nom.* Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962), which is the only District case applying this branch of *O'Donoghue* in any manner. I am aware of no other field of constitutional law in which dicta are so regularly discarded and so candidly acknowledged to be intrinsically lacking in compulsive authority. *See O'Donoghue* itself, 289 U.S. at 550, 53 S.Ct. 740; Williams v. United States, 289 U.S. 553, 568, 13 S.Ct. 751, 77 L.Ed. 1372 (1933); National Mutual Ins. Co. v. Tidewater Transfer Co., 337 U.S. 582, 604 n. 26, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949) (Jackson, J.). A federal judge is therefore nowhere else more obliged in de-

ciding cases to search out underlying principles rather than end his inquiry when he encounters language seemingly in point. *See* Graham v. Brotherhood of Locomotive Firemen, 338 U.S. 232, 236, 70 S.Ct. 14, 94 L.Ed. 22 (1949).

**35.** 337 U.S. 582, 69 S.Ct. 1173, 93 L.Ed. 1556 (1949). *Tidewater* assessed the constitutionality of the present 28 U.S.C. § 1332(d) (1964), which defines the District as a "state" for purposes of statutory diversity jurisdiction. Two Justices (Rutledge and Murphy) concluded that the District was a state within the sense of the diversity clause; the remaining seven disagreed. Three Justices (Jackson, Black and Burton) concluded that Congress could assign Article I jurisdiction to the federal courts generally; six Justices denied this, and vehemently. The five votes favoring the legislation provided a majority, although each of the two theories proposed to vindicate the statute was voted down by a majority. *Compare* the discussion of judicial voting procedures in MURPHY, ELEMENTS OF JUDICIAL STRATEGY 85–87 (1964). *Tidewater* decided the issue for the parties before it, and apparently is a lasting precedent for the constitutionality of § 1332(d).

**36.** At least four Justices in two opinions in *Tidewater* arrayed themselves in opposition to the notion of a dual status for United States courts in the District. Mr. Justice Rutledge's opinion reproved "the contradictions, complexities and subtleties which have surrounded the courts of the District of Columbia in the maze woven by the 'legislative court—

traordinary Article I jurisdiction over matters concerning the District. But *Tidewater* indicated that the District clause in and of itself does not permit Congress to attach such jurisdiction to federal district courts generally; six Justices there spurned the suggestion that a regular federal court could legitimately acquire a mixed jurisdiction, even under authorizing legislation explicitly grounded in the District clause and expressing Congress' deliberated policy of giving District litigants due access to federal forums.[37]

After *Tidewater, O'Donoghue* might have been assigned the rather practical-minded but perhaps satisfactory explanation that circumvention of Article III, intolerable if it applies to federal courts generally, can be condoned if isolated to one or two special courts. But that prop has been swept aside by the recent decision in Glidden Co. v. Zdanok, 370 U.S. 530, 82 S.Ct. 1459, 8 L.Ed.2d 671 (1962). There, after recognizing that the Court of Claims and the Court of Customs and Patent Appeals are within Article III, the Supreme Court, insisting on Article III purity, indicated they would be forbidden from thereafter exercising any incidents of Article I jurisdiction which might be found to remain in their portfolios.

Since Congress' Article I authority over customs, patents, and the settlement of federal liabilities is at first blush as complete and exclusive as that over District matters, *Glidden* and *O'Donoghue* are not easily reconciled; after *Glidden*, the most that might remain of the *O'Donoghue* dictum is that Congress may, under the District clause of Article I but no other, invest one or two Article III courts with Article I business, but only if the courts are physically located within the District. It is not easy to capture a general constitutional principle which can rationalize so unusually particularized a result; to say that the federal courts here are *sui generis* is to assert a conclusion, not to develop a logic which could explain the congressional authority to overcome Article III in begetting these seemingly aberrant institutions.

It should come, then, as no surprise that the *Glidden* prevailing opinion,[38] under the guise of interpreting *O'Donoghue*, in fact probably modified it considerably. In the course of blunting the argument that *O'Donoghue* enables Congress to assign extrajudicial duties to the two courts which happen to sit within the District, because of that geographical link. This suggestion, criticized in Watson, *The Concept of a Legislative Court: A Constitutional Fiction,* 10 Geo.Wash.L.Rev. 799, 820 (1942), was specifically argued and rebuffed in Glidden Co. v. Zdanok, 370 U.S. 530, 580, 82 S.Ct. 1459, 8 L. Ed.2d 671 (1962); *see Glidden,* Brief for the United States, 104–105.

constitutional court' controversy running through this Court's decisions concerning them." 337 U.S. at 604–605, 69 S.Ct. at 1184; and Mr. Justice Frankfurter expounded doctrine which by implication repudiated *O'Donoghue* on this point. 337 U.S. at 648, 652, 69 S.Ct. 1173.

37. That the court in question was located in Maryland, outside the District, did not deprive the statute of the support of the District clause, for it is clear that legislation, if it is related to governing the District, may have legal effects beyond its boundaries. *See* Cohens v. Com. of Virginia, 19 U.S. (6 Wheat.) 264, 425–429, 5 L.Ed. 257 (1821). Congress, for example, could define the substantive law governing contracts to which a District citizen is a party, even though the agreements are entered into and sued upon in Maryland or elsewhere.

Conversely, it demeans the constitutional issue to suggest that the District clause empowers Congress freely to manipulate the jurisdiction of federal courts

38. The opinion was by Mr. Justice Harlan, joined by Justices Brennan and Stewart. The Chief Justice and Mr. Justice Clark concurred separately because they reached the conclusion that the courts in question were created under Article III by independent reasoning. They agreed, however, that a hybrid status for those courts would be wrong, and their opinion is absent any intimation that they disagreed with the plurality opinion's reasoning on that point. Justices Black and Douglas dissented, and Justices Frankfurter and White did not sit.

in question, it read *O'Donoghue* as signifying the following:

"The restraints of federalism are, of course, removed from the powers exercisable by Congress within the District * * *. Thus those limitations implicit in the rubric 'case or controversy' that spring from the Framers' anxiety not to intrude unduly upon the general jurisdiction of the state courts * * * need have no application in the District." 370 U.S. at 580, 82 S.Ct. at 1489.

This view draws attention to inoffensive ways in which District of Columbia federal courts are undeniably unique within the federal judicial system. They cope daily with probate proceedings and in the past have entertained jurisdiction over divorce—areas of the law which other federal courts must shun whether or not diversity or alternative jurisdiction bases are satisfied.[39] As common law courts they are free even in the absence of diverse citizenship to entertain ordinary civil actions,[40] and to apply in those cases legal doctrines which they independently discover or formulate. *Compare*

Erie R. R. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938). On its criminal side the District Court regularly tries serious local crimes—including robbery and murder—which, as federal officials remind us,[41] are ordinarily beyond the sweep of federal jurisdiction.

These features all stem from the absence here of a state judicial establishment whose jurisdiction would complement and dovetail with the jurisdiction assumed by the federal courts. *See* Kendall v. United States, 37 U.S. (12 Pet.) 524, 619, 9 L.Ed. 1181 (1838). And these features, *Glidden* strongly suggests, define the outermost limits of the extraordinary jurisdiction of the District federal courts [42]; the urgent need to occupy what would otherwise be a judicial vacuum hardly licenses this court to accept functions in no sense legitimately judicial. The significance of *Glidden's* discussion of § 101, cited by the majority in another context, is the Court's *un*willingness there to locate authority for § 101 in Article I.[43] That the opinion displays caution in not shrinking *O'Donoghue* expressly does not alter its plain direc-

---

39. *See* State of Ohio ex rel. Popovici v. Agler, 280 U.S. 379, 50 S.Ct. 154, 74 L.Ed. 489 (1930); Byers v. McAuley, 149 U.S. 608, 13 S.Ct. 906, 37 L.Ed. 867 (1893).

40. *See* Pang-Tsu Mow v. Republic of China, 91 U.S.App.D.C. 324, 201 F.2d 195 (1952), *cert. denied*, 345 U.S. 925, 73 S.Ct. 784, 97 L.Ed. 1356 (1953).

41. *E. g.*, MARSHALL, FEDERALISM AND CIVIL RIGHTS 5 (1964).

42. Intriguing wrinkles concerning the classification of the idiosyncratic jurisdiction of the D.C. federal courts need not be ironed out here. Divorce and probate proceedings, while they may lack, as Mr. Justice Harlan suggests, the elements of "case or controversy," may be immune from federal court jurisdiction only because of tacit exceptions to the diversity statute, or to the diversity clause of the Constitution. *See* Vestal & Foster, *Implied Limitations on the Diversity Jurisdiction of Federal Courts*, 41 MINN.L.REV. 1 (1956). Cases arising under Acts of Congress legislating for the District should clearly fall within regular Article III federal question

jurisdiction; and since the District of Columbia is a federal enclave, its common law may *pro tanto* be encompassed by federal question jurisdiction also. These suggestions are bolstered by the intermittent Supreme Court practice of reviewing constructions our Court of Appeals places on statutes in the D.C. Code, *e. g.*, Kent v. United States, 383 U.S. 541, 86 S.Ct. 1045, 16 L.Ed.2d 84 (1966), and likewise its rulings under the common law. *E. g.*, Fisher v. United States, 328 U.S. 463, 66 S.Ct. 1318, 90 L.Ed. 1382 (1946); Looney v. Metropolitan R. R., 200 U.S. 480, 26 S.Ct. 303, 50 L.Ed. 564 (1906). Others, however, have assumed that cases arising under our local common law fail to pose federal questions. Katz, *supra* Note 33, at 902–903.

43. After itemizing the ways in which Article I permits an enlarged jurisdiction for District federal courts (probate, divorce), the Court says that authority for § 101 and 21 D.C.CODE § 308 (1961) (see note 7 of this opinion) "is probably traceable" to Article *II*, 370 U.S. at 581 n. 54, 82 S.Ct. 1459.

tion.[44] And since the perplexity of a local judicial vacuum is a factor aptly distinguishing the District clause from other categories of Article I congressional authority, the *O'Donoghue* hybrid jurisdiction dictum, as re-formulated in *Glidden,* harmonizes well with the emergent constitutional rule that all other Article III courts are unable to receive Article I jurisdiction.

While this constitutional history may not be explicit enough to coerce lower federal courts here to embrace the revisionist doctrine proposed in *Glidden,* it at least relieves them of any obligation to honor and apply the *O'Donoghue* dictum in a mechanical, undiscriminating fashion; the assumption that this court may bypass Article III jurisdictional limitations in some or ordinary circumstances provides no answer to the question whether Congress may require it to appoint a school board.

Not only does § 101 bind the judiciary to a grossly unjudicial chore [45]; but for reasons spelled out just below, it seriously jeopardizes the integrity of this court and interferes with its disposition of the Article III business coming before it. The reasoning in the major part of *O'Donoghue* itself was wedded to the idea that the independence of the District's federal courts must be vigorously affirmed. For these are the courts in which the activities of the federal government are so frequently measured against the rule of law; and District residents deserve a quality of justice no less excellent than that available to citizens in Article

III federal courts elsewhere. 289 U.S. at 539–540, 53 S.Ct. 740. Even *O'Donoghue,* then, provides little support for § 101; permitting it to stand in reliance on that case is to allow dictum to triumph over holding.[46] To do so is especially regressive when we are aware of how time has so eroded the doctrinal foundation of the dictum's most extreme implications, and cast great doubt on their present viability. This court, therefore, should on constitutional grounds decline to accept solely executive tasks, at least when there is firm reason to believe that their execution would seriously damage the integrity of this court derived from Article III.

It is in these respects that § 101 is vulnerable. It has, first, a special ability, exhibited in Part I of this opinion, to embroil the District Court in acute political controversy injurious to its prominence as a court of law. Chief Justice Stone once warned President Roosevelt that when a judge accepts executive responsibilities "[h]e exposes himself to attack and indeed invites it, which because of his peculiar situation inevitably impairs his value as a judge and the appropriate influence of his office." [17] Whether or not these tendencies are inevitable in the general situation, they are vividly illustrated by the District Court's experience with § 101.

That section raises, additionally, the unbecoming spectre of federal judges passing on the legality of acts of their appointees in suits brought by District citizens pressing federal rights, includ-

44. See 370 U.S. at 580 and at 582, 82 S.Ct. 1459, 1489: the "case or controversy" requirement, to the extent it is designed to safeguard the independence of the federal judiciary, "remains fully applicable at least to courts invested with jurisdiction solely over matters of national import." But that this court, in addition to disposing of its regular Article III business, also entertains a limited local jurisdiction does not lessen the necessity for preserving its independence, as *O'Donoghue* itself noted.

45. In *Tidewater,* 337 U.S. at 591, 592, 69 S.Ct. 1173, Mr. Justice Jackson, the

Justice least inhibited by Article III scruples, was willing to let federal courts in the states accept extra-Article III jurisdiction, but only if it were authentically "judicial."

46. The majority makes the large concession that *O'Donoghue* cannot justify this court's assumption of jurisdiction which would be "incongruous" with its Article III status. To that extent these two opinions diverge only in their evaluation of the impact of § 101.

47. Mason, *Extra-Judicial Work for Judges; The Views of Chief Justice Stone,* 67 HARV.L.REV. 193, 203–204 (1953).

ing the constitutional right to equal educational opportunity. The dangers inhering in judicial review of action in which the court or judge is in some way implicated were recognized at the Constitutional Convention [48] and have been echoed by some of our leading jurists.[49] For the District Court to preside over a school board lawsuit might provoke a serious constitutional question, since "[e]very procedure which would offer a possible temptation to the average man as a judge * * * not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law." Tumey v. State of Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927), quoted and applied in In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955).

We need not reckon today, however, with the issue whether in public litigation § 101 would of its own force deprive civil plaintiffs of due process [50]; the question here is whether its impact is severe enough to prove it incongruous with the integrity of the judicial process. Fearful of the tenacity with which human beings, not excluding judges, seek to justify their behavior and presume it justifiable, I must conclude so. At the very least, private counsel in school board litigation, wary of antagonizing the court, would hesitate to condemn the board with the vigor that circumstances might imaginably warrant; and board members involved in litigation might themselves become inhibited in court as they brood on their subjection to reappointment by the judges as their terms expire and to recall at any moment. Decisions of the court upholding the board would, moreover, be susceptible to understandably cynical popular interpretations.[51] The need to preserve judicial integrity is more than just a matter of judges satisfying themselves that the environment in which they work is sufficiently free of interference to enable them to administer the law honorably and efficiently. Litigants and our citizenry in general must also be satisfied.

48. Opposing a proposal to include federal judges in a council of revision which would have been empowered to veto legislation, Rufus King argued: "[T]he Judges ought to be able to expound the law as it should come before them, free from the bias of having participated in its formation." 1 FERRAND, RECORDS OF THE FEDERAL CONVENTION 109 (1911).

49. In turning down an opportunity to appoint the members or serve as chairman of a five-man United States Ballot Commission set up to handle the problem of soldier voting during World War II, Chief Justice Stone wrote:

"It is enough to say, without more, which might be said, that action taken by the Chief Justice in connection with the administration of the proposed legislation might become subject to review in the Court over which he presides and that it might have political implications and political consequences which should be wholly dissociated from the duties of the judicial office." Quoted in Mason, *supra* Note 47, at 208.

50. The majority distinguishes *Tumey* and *Murchison* by noting that the particular situations there found offensive are not repeated here, without going on to investigate whether the nexus between state and court accomplished by § 101 stirs an evil of similar gravity. One important distinction is, however, available: both of those cases involved criminal prosecutions, where the standards of due process are especially rigorous. But rights secured by federal and constitutional law concerning education should likewise be safeguarded by adherence to very fair procedures.

The majority's analogy to the judicial review of executive action is notably strained. The very point of the tenure guarantee of Article III is to release federal judges from any debts of gratitude running to the President who appointed them. As one Justice told a new colleague worried about pressures from former associates, "Yes, but you are here now." FRANK, MARBLE PALACE 46 (1961).

51. I am not alone in my conclusions. District Judge Luther W. Youngdahl, interviewed in 1952, decried § 101 as "contrary to the separation of powers," and indicated that District Court judges (in the reporter's paraphrase) "were placed in an untenable position because they might have to try cases involving the school board or members." Washington Post, Oct. 6, 1952, p. 10, col. 2.

It could be argued that the problem is easily evaded by assigning a circuit judge to handle these cases. That was the procedure followed in this case—but for the sufficient reason that the district judges here are defendants by virtue of the challenge to § 101. They will not be defendants in future legal actions attacking the administration of the schools. The precedents supply no sure conclusion, but since all the district judges are charged with § 101 responsibility, a district judge presiding over a suit charging the Board with serious or unconstitutional misfeasance should probably *sua sponte* disqualify himself as "so * * * connected with any party * * * as to render it improper, in his opinion, for him to sit on the trial * * * therein." 28 U.S.C. § 455 (1964). And if, in fact, we could be assured that the District Court judge would recuse himself, we would have clear evidence that this nonjudicial function has rendered him unfit fully to perform his primary role.

To hold that the Constitution precludes judicial acceptance of tasks such as these would augur no appreciable inconvenience to Congress in its stewardship over the District. Presently the District Court and the Circuit Court of Appeals exercise practically no jurisdiction, § 101 aside, that is plainly beyond the constitutional boundaries suggested in *Glidden*. The items of jurisdiction dealt with in *Keller, Postum* and *General Electric* have long since been transferred to other tribunals or amended so as to acquire judicial form.[52] And if Congress still wishes to exploit the judiciary for nonjudicial purposes, it could turn to the inferior courts of the District, whose potential jurisdiction, while subject to possible due process limitations, is in no way hemmed in by Article III.[53] Since states, similarly, may attach legislative duties to the non-Article III courts of their own creation, but not to federal trial and appellate courts sitting there, the parity between states and the District which the majority opinion requires would be genuinely present.

The federal courts in the District of Columbia have long labored under the depressing psychology of the old line of cases. Just when it appeared that, with the help of the Supreme Court, we would soon gain recognition of full, unadulterated Article III status and independence equal to federal courts throughout the country, today's decision turns back the clock in holding that, after all, we are still vassals of the Congress.

I respectfully dissent.

---

52. The scope of review in the *Keller* statute has been narrowed, Act of August 27, 1935, § 2, 49 STAT. 882, 43 D.C. CODE § 705 (1961), so that review is now judicial. The *Postum* jurisdiction has been reassigned to the Court of Customs and Patent Appeals. Act of March 2, 1929, c. 488, 45 STAT. 1475, 35 U.S.C. §§ 141–144 (1964). The Act of July 1, 1930, c. 788, 46 STAT. 844, limited review of determinations of the Federal Radio Commission to issues of law. This review as revised was accepted as judicial in Federal Radio Comm'n v. Nelson Bros. Co., 289 U.S. 266, 53 S.Ct. 627, 77 L.Ed. 1166 (1933). The Court has taken note of this withdrawal of non-Article III jurisdiction from the District federal courts. Glidden Co. v. Zdanok, 370 U.S. at 580 n. 53, 82 S.Ct. 1459, 8 L.Ed.2d 671 (opinion of Harlan, J.).

53. In 1906, when § 101 was enacted, the only local inferior courts were a police court and ten other "courts" manned individually by justices of the peace located throughout the city. See Act of March 3, 1901, c. 854, 31 STAT. 1189. The justices of the peace were consolidated into the progenitor of the Court of General Sessions in 1909. Act of Feb. 17, 1909, c. 134, 35 STAT. 623. The D.C. Court of Appeals was not organized until 1942. Act of April 1, 1942, c. 207, 56 STAT. 194.